UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| GULET MOHAMED, | ) |
| Plaintiff, | ) ) ) ) |
| v. | ) ) Case No. 1:11-CV-50 |
| ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States, *et al.*, | ) ) ) |
| Defendants. | ) ) ) |

## DECLARATION OF CHRISTOPHER M. PIEHOTA

I, Christopher M. Piehota, hereby declare the following:

1. (U) I am the Deputy Director for Operations of the Terrorist Screening Center ("TSC").  I became the Deputy Director for Operations in February 2010.  I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since 1995 and have served in a variety of counterterrorism, counterintelligence, intelligence, and senior management positions.

2. (U) The TSC is a multi-agency center that was created by the Attorney General pursuant to Homeland Security Presidential Directive ("HSPD")-6 on September 16, 2003.  The TSC is administered by the FBI and receives support from, *inter alia*, the U.S. Department of Homeland Security ("DHS"), the Department of State ("DOS"), the Department of Justice, and the Office of the Director of National Intelligence. TSC is staffed by officials from multiple agencies, including FBI, DHS, DOS, Transportation Security Administration ("TSA") and U.S. Customs and Border Protection ("CBP").

3. (U) I make this declaration in support of the government's motion to dismiss. The matters stated herein are based on my personal knowledge and my review and consideration of information available to me in my official capacity, including information furnished by TSC personnel, including FBI Special Agents, Federal Air Marshals, other government agency employees or contract employees acting in the course of their official duties.

## OVERVIEW OF U.S. TERROR WATCHLISTS

4. (U) Since the attacks of September 11, 2001, Congress and the President have mandated that federal executive departments and agencies share terrorism information with those in the counterterrorism community that are responsible for protecting the homeland such as CBP officers who conduct inspections at U.S. ports of entry, TSA personnel implementing the No Fly and Selectee lists, and domestic law enforcement officers.

5. (U) Prior to the creation of the TSC in 2003, nine U.S. Government agencies maintained 12 different watch lists intended to accomplish a variety of purposes.[1] Two of these lists, the No Fly and Selectee Lists, were originally maintained by the TSA, which was formerly within the Department of Transportation and is now part of DHS.

6. (U) The Terrorist Screening Database ("TSDB") was created pursuant to HSPD-6 and is the U.S. Government's consolidated terrorist watchlist maintained by the TSC. The TSDB contains no derogatory intelligence information. Instead, the TSDB contains only sensitive but unclassified terrorist identity information consisting of biographic

---

[1] (U) *See,* Government Accountability Office, *Terrorist Watch Lists Should Be Consolidated to Promote Better Integration and Sharing*, GAO-03-322, April 2003.

identifying information such as name or date of birth or biometric information such as photographs, iris scans, and fingerprints.

7. (U) Substantive derogatory or intelligence information concerning international terrorists is maintained by the National Counterterrorism Center (NCTC) in its Terrorist Identities Datamart Environment (TIDE). Pursuant to Section 1021 of the Intelligence Reform and Terrorism Prevention Act of 2004, the NCTC serves as the primary organization in the U.S. Government for analyzing and integrating all intelligence possessed or acquired by the U.S. Government pertaining to terrorism and counterterrorism, excepting purely domestic counterterrorism information.[2] The NCTC also ensures that appropriate agencies have access to and receive intelligence needed to accomplish their assigned missions and serves as the central and shared knowledge bank on known and suspected terrorists and international terror groups, as well as their goals, strategies, capabilities, and networks of contacts and support. Substantive derogatory information regarding domestic terrorists is maintained by the FBI.

8. (U) The TSC receives sensitive but unclassified terrorist identity information (i.e., name, date of birth, place of birth, etc.) regarding international terrorists from NCTC and unclassified terrorist identity information regarding domestic terrorists from the FBI. This unclassified terrorist identity information is derived from classified intelligence or derogatory information that supports a finding that the individual is a known or suspected terrorist. If the individual is being nominated for the No Fly or Selectee lists, additional derogatory information must exist demonstrating that the individual meets the requisite criteria.

---

[2] (U) Because of the codification of NCTC in the Intelligence Reform and Terrorism Prevention Act (IRTPA) of 2004, Executive Order 13354, which originally created NCTC, was revoked by amendments to Executive Order 12333 in July 2008.

9. (U) Names are added to and removed from the No Fly and Selectee Lists through an ongoing nomination and review process. Files from NCTC containing nominations to the TSDB are uploaded to the TSC. These files contain the nominee's identifying information, as well as, the underlying information in support of the nomination. FBI case agents also submit nominations to the No Fly and Selectee Lists by completing the relevant forms and providing a summary of the underlying information that demonstrates that a person, regardless of citizenship, meets the standards for inclusion on either list. TSC refers to all of this underlying information as "derogatory information."

10. (U) TSC personnel then review nominations to determine (a) whether the biographic information associated with a nomination contains sufficient identifying data so that a person being screened can be matched to or distinguished from a watchlisted terrorist on the TSDB; and (b) whether the nomination is supported by the minimum substantive derogatory criteria for inclusion in the TSDB, with limited exceptions, as well as the additional derogatory requirements for the No Fly and Selectee lists.

11. (U) TSA employees assigned to and stationed at the TSC serve as subject matter experts regarding those individuals nominated to the No Fly and Selectee Lists.

12. (U) Generally, nominations to the TSDB requires satisfaction of minimum identifying criteria to allow screeners to be able to discern a match, and satisfaction of a certain substantive derogatory criteria establishing that the individual may be a known or suspected terrorist. Whether the individual satisfies the substantive derogatory criteria is generally based on whether there is reasonable suspicion to believe that a person is a known or suspected terrorist. To meet this standard, the nominator, based on the totality of the circumstances, must rely upon "articulable" intelligence or information which,

taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is a known or suspected terrorist. Mere guesses or "hunches," or the reporting of suspicious activity alone are not enough to constitute a reasonable suspicion and are not sufficient bases to watchlist an individual. Additionally, nominations must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities, such as free speech, the exercise of religion, freedom of the press, freedom of peaceful assembly, and petitioning the government for redress of grievances.

13. (U) Upon conclusion of the TSC's review, TSC personnel will either accept or reject the TSDB nomination. If a nomination is accepted, the TSC will create a TSDB record which includes only the "terrorist identifiers" (*i.e.*, name, date of birth, etc.). Because it is a sensitive but unclassified system, the TSDB does not include substantive derogatory information or classified national security information. This means, as explained in more detail below, that government law enforcement screening officers, such as CBP officers at ports of entry and state and local law enforcement, can use the identifying information from the TSDB even though they may not possess Secret or Top Secret security clearances.

14. (U) The TSDB is a sensitive but unclassified system that is updated continuously. The terrorist identity information contained in the TSDB is deemed For Official Use Only ("FOUO") because it is derived from classified national security and unclassified but sensitive law enforcement information.

15. (U) The TSC, through the TSDB, makes terrorist identity information accessible to various screening agencies and entities by the regular export of updated subsets of TSDB data. For example, the No Fly and Selectee Lists are subsets of TSDB information that are available for passenger and employee screening.

16. (U) DHS defines the No Fly List as "a list of individuals who are prohibited from boarding an aircraft" and the Selectee List as "a list of individuals who must undergo additional security screening before being permitted to board an aircraft."[3]

17. (U) The No Fly and Selectee Lists are treated as Sensitive Security Information (SSI), as is the watchlist status of an individual on either list. *See,* 49 CFR 1520.5(b)(9)(ii).

18. (U) The TSC and the TSDB are supported by a 24 hours a day/7 days a week/365 days a year operations center that is continuously updated with information concerning encounters with known[4] or suspected[5] terrorists.

19. (U) To uphold the directive in HSPD-6 to maintain "thorough, accurate and current" information within the TSDB, several quality control measures are continuously applied by nominating agencies, the TSC, and NCTC. These measures include periodic reviews and audits to guarantee the integrity of the information relied upon for maintenance of TSDB records, and an ongoing responsibility upon the nominating agencies to notify NCTC and TSC of any changes that could affect the validity or reliability of that information. In those cases where modification or deletion of a record relating to

---

[3] (U) *See,* U.S. Department of Homeland Security, Privacy Office, *Report on Effects on Privacy and Civil Liberties: DHS Privacy Office Report Assessing the Impact of the Automatic Selectee and No Fly Lists on Privacy and Civil Liberties as Required Under Section 4012(b) of the Intelligence Reform and Terrorism Prevention Act of 2004, Public Law 108-458*, April 27, 2006.

[4] (U) A known terrorist is an individual who has been convicted of, currently charged with, or under indictment for a crime related to terrorism in a U.S. or foreign court of competent jurisdiction. Watchlisting Guidance, July 2010, Appendix 1, Page 2.

[5] (U) A suspected terrorist is an individual who is reasonably suspected to be, or have been, engaged in conduct constituting, in preparation for, in aid of, or related to terrorism and terrorist activities based on an articulable and reasonable suspicion. Watchlisting Guidance, July 2010, Appendix 1, Page 3.

international terrorism is required, the nominating agency must immediately notify NCTC, which will process the request and transmit it to the TSC for action. For nominations relating to domestic terrorism, the FBI must follow applicable FBI procedures to request that a FBI-nominated TSDB record be modified or deleted. Additionally, the TSC regularly reviews every record stored in the TSDB to ensure that the nominating standards were met, and to correct or remove any record that does not meet those standards.

20. (U) Most of the derogatory information relied on by nominating agencies consists of operational facts derived from underlying international counterterrorism investigations or intelligence collection methods, which are generally classified to protect intelligence sources and methods. When separated from the classified means by which they were obtained, the terrorist identity information stored in the TSDB is deemed sensitive but unclassified for terrorist watchlisting and screening purposes. This allows government officials to access TSDB data for screening purposes without compromising an investigation or intelligence collection methods.

21. (U) Because the contents of the TSDB are derived from classified and sensitive law enforcement and intelligence information, the U.S. Government does not confirm or deny whether an individual is on the watchlist. Disclosure of an individual's watchlist status may reveal, as a general matter that an individual is of counterterrorism investigative interest to the U.S. Government. Revealing U.S. Government interest in a particular individual could also alert any terrorist group associated with the individual that they too may be under investigation.

22. (U) The disclosure of watchlist status could also provide the individual or associated terrorist group with the ability to identify the specific means by which the U.S. Government gathered information about them, thereby endangering classified or law enforcement sensitive sources and methods. By not disclosing the contents of the TSDB, the operational counterterrorism and intelligence collection objectives of the federal government are protected, as well as the personal safety of the officers involved in counterterrorism investigations. The TSDB is an effective tool in the U.S. Government's counterterrorism efforts in part because its contents are not disclosed to the public.

23. (U) Neither confirming nor denying that a person is in the TSDB protects the nature, source and methods of any intelligence gathering that occurred if the individual is or was the subject of a counterterrorism investigation. Publically revealing this type of information could harm national security, because an individual or associated terrorist group could use a person's disclosed TSDB status to their advantage by allowing them to avoid future detection, destroy evidence, coerce witnesses, change plans from what is known by law enforcement or intelligence agencies, or recruit new members who are unknown to the Government. Releasing an individual's status could enable that person or an associated terrorist group to manipulate or circumvent enhanced airline screening or border inspection procedures, thus increasing their ability to commit an act of terrorism.

24. (U) Furthermore, to confirm that someone is not in the TSDB would imply that silence about another person is actually a confirmation of their status in the TSDB. Confirming that an individual is not in the TSDB or the subject of a national security investigation would substantially harm law enforcement investigative and intelligence gathering interests because such knowledge would serve to encourage the commission of an act of

terrorism and lead someone intent on committing an act of terrorism to move without detection. Knowing which members of a terrorist group have escaped the attention of law enforcement and intelligence investigations will permit such groups to manipulate the system and provide an incentive for them to prepare for and commit an act of terrorism prior to being detected.

25. (U) Lastly, disclosing the underlying derogatory information used to nominate an individual to the TSDB would compromise ongoing or future intelligence or law enforcement operations and hinder the effectiveness of intelligence gathering methods by limiting the collection techniques used, informing targets of the U.S. government's range of intelligence capabilities, and encouraging the development of countermeasures.

**REDRESS PROCESS**

26. (U) The DHS Traveler Redress Inquiry Program (DHS TRIP) provides the public with a single point of contact for individuals who have inquiries or seek resolution regarding difficulties they experienced during travel screening at transportation hubs (such as airports and train stations) or during their inspection at a U.S. port of entry. DHS TRIP is available at http://www.dhs.gov/files/programs/gc_1169676919316.shtm. This program acts as a mechanism for travelers who have, for example, been delayed or denied airline boarding, delayed or denied entry into or exit from the United States at a port of entry, or have been repeatedly referred for additional (secondary) screening at an airport.

27. (U) Since there are many reasons why a traveler may seek redress, DHS TRIP works with DHS component agencies, such as CBP, TSA and U.S. Immigration and Customs Enforcement ("ICE") and other government agencies, including the Department of State

and the TSC, as appropriate, to make an accurate determination about the traveler's redress matter.

28. (U) The TSC supports DHS TRIP by helping to resolve complaints that appear to be related to data in the TSDB.  This interagency redress process is described in the *Memorandum of Understanding on Terrorist Watchlist Redress Procedures*[6], which was executed on September 19, 2007, by the Secretaries of State, Treasury, Defense and Homeland Security, the Attorney General, the Director of the FBI, the Director of NCTC, the Director of the Central Intelligence Agency, the Director of National Intelligence, and the Director of the TSC.

29. (U) Even though approximately 99% of DHS TRIP complaints do not relate to the TSDB, when a traveler's inquiry may appear to concern data in the TSDB, the matter is referred to the TSC Redress Unit, which assigns the matter to a TSC redress analyst for research. [7]  Upon receipt of a DHS TRIP complaint, TSC Redress reviews the available information, including the information and documentation provided by the traveler, and determines (1) whether the traveler is an exact match to an identity in the TSDB; and, if an exact match exists, (2) whether the identity should continue to be in the TSDB or whether the status should be changed (for example, No Fly to Selectee).

30. (U) In cases where the traveler is an exact match to an identity in the TSDB, the TSC Redress Unit will provide copies of the complaint form and other relevant information to the nominating agency to assist in the resolution of the complaint.  The TSC Redress Unit will then work with the agency that originally nominated the individual to be included in the TSDB to determine whether the complainant's current status in the TSDB is suitable

---

[6] (U) A copy is attached hereto.
[7] (U) The TSC does not accept redress inquiries directly from the public, nor does it respond directly to redress inquiries.

based on the most current, accurate, and thorough information available. The TSC Redress Unit may ask the nominating agency to provide updated information or analysis, as well as for recommendations on addressing the complaint.

31. (U) After reviewing the available information and considering any recommendation from the nominating agency, the TSC Redress Unit will make a determination on whether the record should remain in the TSDB, or have its TSDB status modified or removed, unless the legal authority to make such a determination resides, in whole or in part, with another government agency. In such cases, TSC will only prepare a recommendation for the decision-making agency and will implement any determination once made. When changes to a record's status are warranted, the TSC will ensure such corrections are made. The TSC will also verify that such modifications or removals carry over to the various screening systems that receive TSDB data (*e.g.*, the Selectee and No Fly Lists).

32. (U) After the TSC Redress Unit completes its review of the matter, DHS TRIP is notified of the recommendation so DHS TRIP may send a determination letter to the traveler. The determination letter provides as much information to the traveler as possible without disclosing the traveler's status in the TSDB. The letter does not reveal the person's status because that could alert an individual, or any terrorist group the individual is associated with, to the fact that he or she is of investigative interest to the FBI or other members of the Intelligence Community.

## PROCESS FOR U.S. PERSONS PROHIBITED FROM BOARDING FLIGHTS WHEN LOCATED ABROAD

33. (U) The TSC and the FBI, in coordination with the Department of State, DHS, TSA and CBP, developed policy on how to respond following an encounter with a U.S. person[8] who was prohibited from boarding a flight originating outside the continental United States (OCONUS) that was bound for the United States, due to their possible inclusion on the No Fly List. The goal of the policy is to proactively and quickly resolve the travel issues of U.S. persons located abroad who have been prohibited from boarding flights returning to the United States.

Pursuant to Title 28, United States Code, Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of March, in Virginia.

CHRISTOPHER M. PIEHOTA
Deputy Director for Operations
Terrorist Screening Center

---

[8] (U) "U.S. person" here refers to a U.S. citizen or Lawful Permanent Resident (LPR).

# MEMORANDUM OF UNDERSTANDING
# ON TERRORIST WATCHLIST REDRESS PROCEDURES

The Department of Justice (DOJ), the Federal Bureau of Investigation (FBI), the Terrorist Screening Center (TSC), the Department of Homeland Security (DHS), the Department of State (DOS), the Office of the Director of National Intelligence (ODNI), the National Counterterrorism Center (NCTC), the Central Intelligence Agency (CIA), the Department of Defense (DOD), and the Department of the Treasury (hereinafter referred to as the Parties);

Recognizing that the United States Government has developed a consolidated database of known and suspected terrorists that supports many different screening programs operated under distinct statutory and regulatory authorities;

Recognizing that agencies that contribute to, compile, distribute, and use the consolidated database must use best efforts to maintain current, accurate, and thorough information;

Recognizing that the implementation of the screening programs nonetheless may, at times, still cause inconvenience, delay, or other adverse experiences for individuals during the terrorism screening process;

Recognizing that complaints received regarding the terrorism screening process should be expeditiously reviewed and addressed with dignity and respect;

Recognizing that the experience of travelers and other individuals interacting with government screening personnel is potentially affected by factors outside the terrorism screening scope of this Memorandum of Understanding, including, for example, random screening, screening for involvement with illicit drugs or other illegal conduct, behavioral screening criteria, as well as the basic professionalism and courtesy of government screening personnel, and that attention to these factors must be promoted through other appropriate means within the respective jurisdictions of the Parties;

Recognizing that on January 17, 2006, the Departments of State and Homeland Security announced an initiative on "Secure Borders and Open Doors in the Information Age," otherwise known as the Rice-Chertoff Initiative, including the establishment of a redress process to address perceived problems in international and domestic traveler screening; and

Having consulted with the Privacy and Civil Liberties Oversight Board and the privacy and civil liberties officials of DHS, DOJ, and ODNI, in developing the procedures contained in this agreement;

Hereby enter into this Memorandum of Understanding (MOU).

1.      BACKGROUND

Homeland Security Presidential Directive 6 (HSPD-6), "Integration and Use of Screening Information to Protect Against Terrorism," dated September 16, 2003, required the Attorney General to establish an organization to consolidate the Government's approach to terrorism screening and provide for the appropriate and lawful use of terrorist information in screening processes. Also on September 16, 2003, and in support of HSPD-6, the Memorandum of Understanding on the Integration and Use of Screening Information to Protect Against Terrorism (HSPD-6 MOU) was signed by the Secretary of State, the Attorney General, the Secretary of Homeland Security, and the Director of Central Intelligence establishing TSC. On August 2, 2004, an addendum (Addendum A), which supplemented and incorporated by reference all provisions of the HSPD-6 MOU, was signed by the Secretary of the Treasury and the Secretary of Defense, in addition to the signatories of the HSPD-6 MOU. By their signatures on Addendum A, the Secretary of the Treasury and the Secretary of Defense also became signatories to the HSPD-6 MOU. In 2007, Addendum A was superseded by Addendum B, which added the Director of National Intelligence and the Director of the TSC as signatories.

2.      PURPOSE, SCOPE, AND CONSTRUCTION

The purpose of this MOU is to set forth the mutual understanding of the Parties to establish and implement a coordinated redress process to respond to individual complaints about adverse experiences during terrorism screening that relate to the use of information contained in the government's consolidated database of known and suspected terrorists, known as the Terrorist Screening Database or TSDB. This MOU is intended to complement, and shall not be construed to conflict with, the Constitution, statutes, or regulations of the United States or any Party's legal authority to process screening-related complaints or appeals. To the extent that any provision of this MOU conflicts with any Party's legal authority for screening or to hear appeals, the conflicting provisions of this MOU shall not apply. This MOU does not apply to individual complaints, or parts thereof, that pertain to screening experiences that are unrelated to the use of information contained in the TSDB.

Any reference in this MOU to a Party or Parties shall also be understood to refer to any components of such Party or Parties to the extent that such components fall within the definition of screening agency or nominating/originating agency as set forth below, or that such components have been designated by the Party or Parties as having obligations arising from this MOU. Nothing in this MOU precludes any Party from conducting periodic reviews of individuals in the TSDB to determine whether an individual should remain in the TSDB, have their TSDB status modified, or be removed from the TSDB. Nothing in this MOU shall be construed to interfere with, limit, or impede any Party's ability to protect information that is classified pursuant to Executive Order 12958, as amended, or is otherwise protected by law from disclosure.

2

3.   <u>DEFINITIONS</u>

As used in this MOU, these terms or phrases are defined as follows:

A.   *Complaint or Redress Complaint*:  An individual's statement about an allegedly adverse experience or outcome during a terrorism screening process, which usually includes a request for assistance or a remedy.

B.   *Derogatory Information*:  The information relied upon or generated by a nominating/originating agency to support the nomination of an individual to the TSDB.

C.   *Known or Suspected Terrorist*:  As defined by HSPD-6, an individual known or appropriately suspected to be or to have been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism.  Pursuant to HSPD-6, the TSDB shall include identifying information about all known or suspected terrorists.

D.   *Misidentified Person*:  An individual who has had an adverse experience or outcome during terrorism screening because the individual is a near match to a known or suspected terrorist in the TSDB.  Misidentified persons are not actually listed in the TSDB but usually share an identical or very similar name and date of birth with a person in the TSDB, which causes them to be delayed or otherwise inconvenienced during screening.

E.   *Nominating Agency*:  A Federal agency that has determined that an individual is a known or suspected terrorist and nominates that individual to the TSDB based on information that originated with that agency and/or a third agency.

F.   *Originating Agency*: A Federal agency that generates derogatory or identifying information about a known or suspected terrorist.

G.   *Personally Identifiable Information*: Any representation of information that permits the identity of an individual to whom the information applies to be reasonably inferred by either direct or indirect means including any other information, which is linked to such individual.

H.   *Redress*: The process whereby an individual may seek the help of a screening agency in addressing the cause of an adverse experience or outcome related to the use of TSDB data by filing a complaint with the screening agency.  The screening agency or its designee, in cooperation with TSC and the nominating/originating agency, provides assistance by determining the cause of that adverse experience, verifying that all relevant information relied upon in the screening process is thorough, accurate, and current, and making any warranted corrections to pertinent records.  The redress process as defined in this paragraph does not apply to complaints related to the visa application process.

I.   *Screening Agency*:  Any agency that conducts terrorism screening.  A screening agency acquires information for the purpose of determining whether an individual is a known or suspected terrorist in the TSDB, and evaluates and/or uses that information in order to take a particular governmental action with respect to an individual, such as requiring additional physical security screening at an airport security checkpoint, determining admissibility into the United States, or similar

governmental action.  The DOS and DHS shall not be considered screening agencies with respect to the visa application process.

J.  *Terrorism Screening*:  The evaluation of an individual to determine whether he or she is a known or suspected terrorist identified in the TSDB in order to take a particular governmental action with respect to an individual, such as requiring additional physical security screening at an airport security checkpoint, determining admissibility into the United States, or similar governmental action.

K.  *Terrorist Screening Database or TSDB*:  The Federal government's consolidated database that contains identifying information about known or suspected terrorists.  It is also commonly known as the consolidated terrorist watchlist.  The TSDB is a sensitive but unclassified database and does not contain any derogatory information.

L.  *TIDE*:  NCTC's Terrorist Identities Datamart Environment (TIDE), which is a classified database containing the derogatory information that supports the nominations of known or suspected international terrorists to the TSDB.

4.  <u>RESPONSIBILITIES OF THE PARTIES</u>

A.  <u>Responsibilities of All Parties</u>:

i.  <u>Designation of Responsible Official</u>.  Each Party will identify a senior official who will be responsible for ensuring the Party's full participation in the redress process and overall compliance with this MOU.  A Party may also designate redress officials for components of that Party that perform screening or nominating/originating agency functions.  The Parties agree to identify these officials and exchange the names of these officials no later than 30 calendar days after this MOU becomes effective and update the information as needed thereafter.

ii.  <u>Resources</u>.  Subject to the availability of funds, each Party will identify and commit appropriate staff and other resources to carry out responsibilities under this MOU.  This includes identifying the office(s) responsible for carrying out the Party's responsibilities pertaining to the processing of individual redress complaints as set forth in this MOU.  The Parties agree to exchange the names and contact information for the responsible offices no later than 30 calendar days after this MOU becomes effective, and update the information as needed thereafter.

iii.  <u>Information Sharing</u>.  Each Party will share all information relevant to the resolution of a complaint with other Parties to the extent necessary to carry out this MOU or to defend any judicial challenge to the resolution of a complaint, consistent with legal requirements and classification and handling controls.  A Party may provide the relevant information in a summarized or substituted format to protect sensitive sources and methods.

iv.  <u>Protection of Personally Identifiable Information</u>.  Each Party will take appropriate action to protect personally identifiable information (PII) in its own record systems related to a redress matter against unauthorized access

4

and to ensure that PII is handled in a way that provides security and accountability. When Parties transmit PII related to a redress matter via non-electronic or electronic means, such as email, facsimile, portable media or otherwise, the Parties will properly mark the data and/or communications/media/device to provide appropriate notice of the existence of PII and will ensure the means of transmission are secured by encryption or equivalent protections.

v.   <u>Administrative Record</u>.  Each Party will be responsible for maintaining the administrative records necessary to document its participation in the redress process.

vi.  <u>Updating Agency Records</u>.  Each Party that maintains data related to the terrorist watchlist in its paper and/or electronic recordkeeping systems will update its records (i.e., correct, modify, or delete) expeditiously once notified of a change to an individual's watchlist status as the result of the disposition of a redress matter.  This provision applies to data in government information systems (e.g., TIDE, Treasury Enforcement Communications System/Interagency Border Inspection System (TECS/IBIS), No-Fly List, Consular Lookout And Support System) used for watchlist creation or screening purposes.  It is not intended to require the Parties to change records that reflect actions already taken based on watchlist status, unless and only to the extent that the record will have an unwarranted adverse impact on the individual seeking redress.

vii. <u>Litigation</u>.  Subject to paragraph 4.A.iii above, each Party agrees to cooperate with DOJ to assist in defending any judicial challenge to the resolution of a redress complaint processed under this MOU or a determination by a screening agency that relied in whole or in part on records or information in the TSDB.  This provision shall not be construed to limit DOS's discretion under section 222(f) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1202(f), concerning the disclosure of visa records in litigation.

viii. <u>Privacy Act Compliance</u>.  In carrying out this MOU, each Party is responsible for its own compliance with the Privacy Act of 1974, 5 U.S.C. §§ 552a *et seq.*, in the collection, maintenance, use, and dissemination of personally identifiable information.  Within 30 calendar days after the effective date of this MOU, each Party agrees to review its applicable Privacy Act system of records notices and any relevant forms used to collect information from the public where such information may ultimately be used during the redress process.  Each Party agrees to make appropriate changes to those documents, if necessary, including the publication of new or modified routine uses to permit the sharing of information to resolve redress matters and related litigation.

ix.  <u>Record Retention</u>. Each Party agrees to retain its redress records for at least six years from the date of final agency disposition.  Agencies may

5

elect to establish a longer retention period to meet statutory, regulatory, or operational requirements.

x.   <u>Requests for Disclosure of TSDB Data</u>.  Unless and until TSC advises the Parties of an alternate procedure, each Party agrees that it will contact TSC's legal counsel if it receives a request for information or records that it knows would reveal an individual's status (positive or negative) in the TSDB or would otherwise reveal the contents of TSDB data.  TSC legal counsel will provide timely guidance on how to respond to these requests.  This provision also pertains to requests for TSDB data resident in supported screening systems, such as the No-Fly List, TECS/ IBIS, the National Crime Information Center's Violent Gang and Terrorist Organization File (VGTOF), and the DOS's Consular Lookout and Support System (CLASS).

B.   <u>Responsibilities of Screening Agencies</u>:

i.   <u>Designation of Responsibilities</u>.  Any Party that is a screening agency may designate another Party, with the other Party's consent if needed, to perform the responsibilities outlined in section 4.B. of this MOU.  In addition, where a screening agency is a component of a Party, the Party may determine at its discretion that any responsibility of that screening agency may be performed in whole or in part by the Party.

ii.   <u>Resources</u>.  Subject to the availability of funds, each screening agency will designate or create an office to carry out its operational responsibilities for redress.  Where a Party has several components that perform terrorism screening, the responsible official for that Party (*see* Section 4.A.i above) will determine whether a single centralized office or separate offices in the appropriate components, or some combination of the two, will perform this function.  Subject to the availability of funds, each screening agency will commit sufficient and appropriate staff and resources to that office or offices to ensure redress complaints are processed in a timely and efficient manner.  The screening agencies agree to notify the other Parties of the identity of and contact information for the designated offices under this paragraph no later than 30 calendar days after this MOU becomes effective and update that information as needed.

iii.   <u>Receipt and Initial Processing of Complaints</u>.  Each screening agency will have a procedure for receiving complaints from members of the public.  If the screening agency receives a complaint from an individual who appears to be in the TSDB and the complaint relates to an adverse effect in the screening process arising out of his/her placement in the TSDB, the agency will forward a copy of the complaint and related information to TSC within a reasonable time.  The screening agency will be responsible for verifying the identity of the complainant in accordance with the screening agency's applicable regulations and policies.  When forwarding a complaint to TSC, the screening agency must provide: (1) all relevant correspondence from the individual, (2) copies of any relevant internal

agency records, and (3) information identifying the complainant including, at a minimum, the complainant's full name, date of birth, and place of citizenship. After consultation with affected Parties, TSC may revise these requirements in the future as needed for expeditious processing of redress complaints. No amendment to the MOU would be required to effectuate such a change.

iv.   <u>Follow-up with the Complainant</u>. If requested by TSC, the screening agency will contact the complainant to request additional information to assist TSC or the nominating/originating agency in verifying the complainant's identity and processing the complaint. Nothing in this subsection precludes a screening agency from contacting the complainant in accordance with the screening agency's procedures or discretion.

v.   <u>Response to the Complainant</u>. Screening agencies are responsible for providing a written response to complaints they receive based on information provided by TSC and the nominating/originating agency. Because of the sensitivity of the TSDB and derogatory information, the content of any response to a complaint must be coordinated with TSC and the nominating/originating agency through TSC. Screening agencies may use standardized response letters that have been coordinated in advance by the screening agency, TSC, and DOJ.

vi.   <u>Redress for Misidentified Persons</u>. On January 17, 2006, DHS and DOS announced an initiative on "Secure Borders and Open Doors in the Information Age," otherwise known as the Rice-Chertoff Initiative, which includes the establishment of a redress process to address perceived problems in international and domestic traveler screening. The DHS Screening Coordination Office is leading the inter-agency effort to fulfill the goals of the Rice-Chertoff Initiative, which is intended to improve the redress process for persons who are misidentified during traveler screening processes, among other improvements.

vii.   <u>Administrative Appeals</u>. If the screening agency has established an administrative appeals process for redress determinations or other agency determinations in which the TSDB was used, the screening agency will notify TSC after receiving any such administrative appeal and work with TSC, as needed, to process the appeal, and coordinate the final agency response with TSC. The screening agency will provide all relevant paperwork to TSC (including a copy of the appeal letter and any information submitted by the individual on their own behalf). When the screening agency has the legal authority to make the final decision on the appeal, it will promptly notify TSC of that decision.

viii.   <u>Litigation</u>. When the screening agency becomes aware of litigation arising out of terrorism screening, the screening agency will notify TSC and DOJ as soon as possible after identifying the nexus to the TSDB. Notification should occur as soon as the Party learns of an individual's intent to sue or immediately after being served with legal process.

7

C. <u>Responsibilities of the Terrorist Screening Center</u>:

    i.    <u>Receipt and Coordination of Complaints</u>.  TSC will receive complaints from screening agencies and research them to determine the nature and cause of the individual's adverse experience.  TSC will track all complaints and will be responsible for facilitating any inter-agency coordination necessary to properly research the complaint and respond to the screening agency regarding the outcome (e.g., any corrections made or recommended).

    ii.    <u>Review of Basis for Inclusion in the TSDB</u>.  In cases where the complainant is or appears to be in the TSDB, TSC will provide copies of the complaint letter and other relevant information to NCTC and/or the nominating/originating agency to assist in the resolution of the complaint.  TSC will then work with NCTC and/or the nominating/originating agency, as appropriate, to determine whether the complainant's current status in the TSDB is appropriate based on the most current, accurate, and thorough information available.  TSC may ask NCTC and/or the nominating/originating agency to provide updated information or analysis to assist in this determination as well as for a recommendation on addressing the complaint.

    iii.    <u>Determination</u>.  After reviewing the available information and considering any recommendation from the nominating/originating agency, TSC will make a determination whether the record should remain in the TSDB, have its TSDB status modified, or be removed, unless the legal authority to make such a determination resides, in whole or in part, with another agency.  In such cases, TSC will only prepare a recommendation for the decision-making agency and will implement any determination once made. TSC will take any necessary action to implement the determination, such as removing the record from the TSDB or modifying the record's status in the TSDB (e.g., downgrade from No-Fly to Selectee).  Before taking action that is inconsistent with a recommendation of the nominating/originating agency, TSC will notify NCTC, which will convey that determination back to the nominating/originating agency, unless the nominating/originating agency is the FBI, in which case TSC will contact the FBI directly.  The nominating/originating agency will then be responsible for addressing the conflict with TSC or the decision-making agency either directly or through NCTC.  The Parties will then coordinate on an agreed-to resolution.

    iv.    <u>Update of the TSDB</u>.  TSC will ensure that TSDB records are appropriately deleted or modified in accordance with a determination on a redress matter.  TSC will also verify that such removals or modifications carry over to other screening systems that receive TSDB data (e.g., TECS/IBIS, No-Fly List).

    v.    <u>Deconfliction</u>.  In the event of a multi-agency nomination where the nominating and/or originating agencies do not agree on what recommendation should be made on a specific redress matter, TSC will

request that the agencies consult with one another and share appropriate information about the watchlisted individual in an attempt to provide a joint recommendation to TSC.  If the nominating/originating agencies cannot agree to a joint recommendation, TSC (or other agency with the legal authority to make the decision) will make the final determination considering the information provided by each agency.

vi.   <u>Review Related to Misidentified Persons</u>.  If a complainant's adverse experience or outcome during terrorism screening is a result of being a near match ("misidentified") to a record in the TSDB, and that complaint is referred to TSC by the screening agency, TSC will review the record in the TSDB, as described in the paragraphs above, to ensure the TSDB record is valid and satisfies the criteria for inclusion in the TSDB and determine if additional information can be added to TIDE, the TSDB, or other agency systems to reduce the likelihood of a future misidentification.  If the record does not meet the criteria, it will be removed from the TSDB.

vii.   <u>Administrative Appeals</u>.  TSC will work with a screening agency to assist it in processing any administrative appeal of a redress determination or other determination in which the TSDB was used.  When TSC receives notice of an appeal, TSC will notify NCTC and/or the nominating/originating agency as soon as possible. TSC will facilitate communications between the nominating/originating and screening agencies on the following issues: (1) determining what material may be releasable to the individual during appeal (if applicable), and (2) updating the analysis of any information that may have developed since the original determination and/or any information that was provided by the individual on his or her behalf during the appeals process itself.  After reviewing the available information and considering any recommendation from the nominating/originating agency, TSC will make a determination whether the record should remain in the TSDB, have its TSDB status modified, or be removed, unless the legal authority to make such a determination resides, in whole or in part, with another agency.  In such cases, TSC will only prepare a recommendation for the decision-making agency and will implement any determination once made.

viii.   <u>Litigation</u>. When TSC becomes aware of litigation arising out of terrorism screening, TSC will notify NCTC, the nominating/originating agency, and DOJ as soon as possible.

D.   <u>Responsibilities of the National Counterterrorism Center</u>:

i.   <u>Review, Coordination, and Research of Complaints</u>.  Upon receipt of a complaint from TSC, NCTC will review its holdings, notify the nominating/originating agency of the complaint, and provide the nominating/originating agency with a copy of the complaint for review.

NCTC will then request that the nominating/originating agency and, as appropriate, any other agency with relevant information, review their holdings and provide NCTC information relevant to the complaint.  This may include updated information or analysis regarding the complainant's current status in the TSDB, derogatory information, identifying information that might be relevant to a misidentification, or other potentially relevant information or analysis (including that which tends to show that the individual is not a known or suspected terrorist, or which otherwise tends to cast doubt on the derogatory information).  NCTC will also request that the nominating/originating agency provide its recommendation regarding resolution of the complaint.  With the concurrence of the nominating/originating agency, NCTC will provide that agency's recommendation and any other relevant information to TSC.  Should TSC or another agency disagree with the recommendation, NCTC will assist in the deconfliction process as set forth above.  NCTC generally will not receive or process complaints or appeals for individuals nominated only by the FBI.

ii.   Review Related to Misidentified Persons.  If a complainant's adverse experience or outcome during terrorism screening was the result of being a near match ("misidentified") to a record in the TSDB, and that complaint is referred to TSC by the screening agency, NCTC will work with TSC and the nominating/originating agency to ensure the TSDB record is valid and satisfies the criteria for inclusion in the TSDB, and determine if additional information can be added to TIDE, the TSDB, or other agency systems to reduce the likelihood of a future misidentification.

iii.  Update of TIDE.  NCTC will promptly update TIDE records with any new derogatory or other relevant information (including that which tends to show that the individual is not a known or suspected terrorist, or which otherwise tends to cast doubt on the derogatory information) pertaining to individuals in the TSDB.  NCTC will also modify TIDE in a timely fashion to reflect modifications to TSDB nominations resulting from a redress complaint and will make appropriate changes to a given TIDE record when it is necessary to trigger electronically conforming changes to the TSDB record.

iv.  Administrative Appeals.  NCTC will work with TSC, as needed, to assist it in processing any administrative appeal of a redress determination or other determination in which the TSDB was used, including coordinating communication between TSC, the screening agency, and the relevant nominating/originating agency, as necessary.  NCTC's primary role will be to coordinate administrative appeal requests by TSC with the appropriate nominating/originating agency in the Intelligence Community other than the FBI.

E. <u>Responsibilities of Nominating/Originating Agencies</u>:

i. <u>Review, Coordination, and Research of Complaints</u>.  Once notified of a redress complaint by TSC or NCTC, the nominating/originating agency will review the derogatory information that is the basis for including the complainant in the TSDB.  In coordination with NCTC, when appropriate, the nominating/originating agency will evaluate whether the complainant continues to satisfy the criteria for inclusion in the TSDB, as well as any other relevant criteria, such as those for the No-Fly and Selectee Lists. The nominating/originating agency will determine whether updated information or analysis exists, including information from other agencies, and incorporate any such information in its response.  The nominating/originating agency will also consider any information provided through the redress process by the individual, the screening agency, NCTC, or TSC.  The nominating/originating agency shall take appropriate steps to modify, correct, or delete its holdings to reflect any changes made to TIDE as a result of the redress process, or that otherwise have been determined to be in error as a result of the redress process.

ii. <u>Recommendation</u>.  The nominating/originating agency may make a recommendation to TSC as to the resolution of any complaint.  Continued inclusion in the TSDB must be supported by derogatory information in TIDE.  When the nominating/originating agency has additional derogatory or other relevant information that is not in TIDE, the nominating/originating agency will ensure that NCTC and TSC are notified, and will work with NCTC and TSC to ensure that such information is added to TIDE in a manner that provides meaningful information while protecting sources and methods.  Every effort should be made, however, to share the derogatory information with TSC whenever possible.

iii. <u>Deconfliction</u>.  In the event of a multi-agency nomination where the nominating and/or originating agencies do not agree on what recommendation should be made on a specific redress matter, the agencies will consult with one another at TSC's request and share appropriate information about the watchlisted individual in an attempt to provide a joint recommendation to TSC.  If the nominating/originating agencies cannot agree to a joint recommendation, TSC will make the final determination considering all of the available information.

iv. <u>Review Related to Misidentified Persons</u>.  If a complainant's adverse experience during terrorism screening was the result of being a near match ("misidentified") to a record in the TSDB, the nominating/originating agency of that record will work with TSC and NCTC, as appropriate, to ensure the TSDB record is valid and satisfies the criteria for inclusion in the TSDB, and if additional information can be added to TIDE, the TSDB, or other agency systems to reduce the likelihood of a future misidentification.

11

     v.    <u>Administrative Appeals</u>.  Each nominating/originating agency will work with TSC and NCTC, as needed, to assist them in processing an appeal of a redress determination or other determination in which the TSDB was used.  The nominating/originating agency will be responsible for advising the screening agency on the releasability of any materials requested by an appellant during an appeal.  An updated analysis of all relevant information will be coordinated between NCTC and the nominating/originating agency, and will be forwarded to TSC, which in turn will provide it to the screening agency.  The analysis will consider any new information developed since the initial determination, as well as any information provided by the individual on his or her own behalf during the appeals process itself.

F.    <u>Responsibilities of the Department of Justice</u>:
    i.    DOJ will coordinate with the relevant Parties during the defense of any judicial challenge to the resolution of a complaint processed under this MOU or a determination by a screening agency that relied in whole or in part on records or information in the TSDB.
    ii.    DOJ will consult with the Parties, as necessary, to provide continuing legal advice and support on matters related to watchlisting redress and this MOU.

G.    <u>Visa Application Process; DOS and DHS Responsibilities at the Time of Visa Refusal</u>:
    i.    DOS and DHS will continue to comply with applicable visa procedures, which may include an at-post internal review by a supervisory consular officer or another appropriate official.  While a consular officer's denial of a visa application may not be overruled, that determination is informed by an internal management review and, in appropriate cases, by input from an interagency review.
    ii.    If a visa application is refused, applicants are advised that they may re-apply for a visa.  A subsequent application is considered as a new case.  DOS agrees to continue to review the underlying data and facts in such subsequent applications.  Whenever appropriate, DOS consults with TSC, NCTC, and other agencies regarding data that appears incomplete or inaccurate, or otherwise conflicts with information obtained in the visa application process.

5.    <u>SETTLEMENT OF DISPUTES</u>

Except as set forth in paragraphs 4.C.v and 4.E.iii concerning the deconfliction of watchlist nominations, disagreements between the Parties arising under or related to this MOU will be resolved only by consultation between the Parties.

6.      OTHER PROVISIONS

This MOU is not intended to conflict with either the Constitution or current federal statutes, regulations, or the directives of the Parties.  If any term or provision of this MOU is inconsistent with such authority, then the term or provision shall be inapplicable to that Party and any other Party that is dependent upon the first Party's action to perform its responsibilities, but the remaining terms and conditions of this MOU shall continue to apply.

7.      AMENDMENT

This MOU may be amended at any time by the mutual written consent of the Parties' authorized representatives.  Modification within the scope of this MOU shall be made by the issuance of a fully executed addendum prior to any changes in responsibilities being performed.

8.      TERMINATION

The terms of this MOU, as it may be amended, will remain in effect indefinitely.  To terminate its participation in this MOU, a Party must give at least 30 days prior written notice.  In the event of termination, each Party will continue with full participation up to the effective date of termination.

9.      NO OBLIGATION OF FUNDS

This MOU does not constitute an obligation to expend funds by any Party.  Unless otherwise agreed in writing, each Party shall bear any costs it incurs in relation to this MOU.  Expenditures will be subject to federal budgetary processes and availability of funds pursuant to applicable laws and regulations.  The Parties expressly acknowledge that this MOU in no way implies that Congress will appropriate funds for such expenditures.

10.     NO PRIVATE RIGHTS

This MOU is an internal arrangement between the Parties and is not intended, and should not be construed, to create any right or benefit, substantive or procedural, enforceable at law or otherwise by any third party against the Parties, their parent or component agencies, the United States, or the officers, employees, agents or other associated personnel thereof.

11.     EFFECTIVE DATE

The terms of this MOU will become effective on the date on which it is signed by all Parties.  The MOU may be signed in counterparts.

12.     PERIODIC REVIEW

The Responsible Officials designated by the Parties pursuant to section 4.A.i will meet on an annual basis or at the request of any Party to discuss and review the implementation of this

MOU.  Failure of the parties to conduct annual reviews will not result in the termination of activities provided for under this MOU.

13.     POINTS OF CONTACT

Points of contact (POCs) for the Parties, identified below, are responsible for identifying the responsible officials and redress resources pursuant to sections 4.A.i and ii, and 4.B.ii and providing that information to the other POCs.

A.      The POC for the Department of Justice will be the Chief Privacy and Civil Liberties Officer.

B.      The POC for the Federal Bureau of Investigation will be the Section Chief of the National Threat Center Section, Counterterrorism Division.

C.      The POC for the Terrorist Screening Center will be the Privacy Officer.

D.      The POC for the National Counterterrorism Center will be the Chief of the Terrorist Identities Group.

E.      The POC for the Department of Homeland Security will be the Director of the Screening Coordination Office.

F.      The POC for the Department of State will be the Director of Information Management and Liaison Staff, Visa Office.

G.      The POC for the Office of the Director of National Intelligence will be the Civil Liberties Protection Officer.

H.      The POC for the Central Intelligence Agency will be the Chief of Policy and Community Action Staff (PCAS).

I.      The POC for the Department of Defense will be the Director, Joint Intelligence Task Force for Combating Terrorism, Defense Intelligence Agency.

J.      The POC for the Department of the Treasury will be the Assistant General Counsel (Enforcement and Intelligence).

The foregoing represents the understanding reached by the Parties.

**APPROVED BY**:

_____               _____
Condoleezza Rice                                Date
Secretary of State


_____               _____
Henry M. Paulson, Jr.                           Date
Secretary of the Treasury


_____               _____
Alberto R. Gonzales                             3-6-07
Attorney General                                Date


_____               _____
Robert M. Gates                                 Date
Secretary of Defense


_____               _____
Michael Chertoff                                Date
Secretary of Homeland Security


_____               _____
John D. Negroponte                              Date
Director of National Intelligence

15

Robert S. Mueller, III
Director, Federal Bureau of Investigation

1/29/07
Date


John Scott Redd
Director, National Counterterrorism Center

Date


Gen. Michael V. Hayden
Director, Central Intelligence Agency

Date


Richard S. Kopel
Acting Director, Terrorist Screening Center

1/19/07
Date


16

The foregoing represents the understanding reached by the Parties.

**APPROVED BY**:

_____
Condoleezza Rice
Secretary of State

_____
Date

_____
Henry M. Paulson, Jr.
Secretary of the Treasury

_____
Date

_____
Alberto R. Gonzales
Attorney General

_____
Date

_____
Robert M. Gates
Secretary of Defense

_____
Date

_____
Michael Chertoff
Secretary of Homeland Security

_____
Date

_____
John D. Negroponte
Director of National Intelligence

February 5, 2007
_____
Date

15

Robert S. Mueller, III                                  Date
Director, Federal Bureau of Investigation


John Scott Redd                                         Jan 30, 2007
Director, National Counterterrorism Center              Date


Gen. Michael V. Hayden                                  Date
Director, Central Intelligence Agency


Richard S. Kopel                                        Date
Acting Director, Terrorist Screening Center


16

The foregoing represents the understanding reached by the Parties.

**APPROVED BY**:


_____                    _____
Condoleezza Rice                                    Date
Secretary of State


_____                    _____
Henry M. Paulson, Jr.                               Date
Secretary of the Treasury


_____                    _____
Alberto R. Gonzales                                 Date
Attorney General


_____                    _____
Robert M. Gates                                     Date
Secretary of Defense


_____                    _____
Michael Chertoff                                    Date
Secretary of Homeland Security


_____                    _____
John D. Negroponte                                  Date
Director of National Intelligence


15

The foregoing represents the understanding reached by the Parties.

**APPROVED BY**:


_____          05/17/2007
Condoleezza Rice                          Date
Secretary of State



_____          _____
Henry M. Paulson, Jr.                     Date
Secretary of the Treasury



_____          _____
Alberto R. Gonzales                       Date
Attorney General



_____          _____
Robert M. Gates                           Date
Secretary of Defense



_____          _____
Michael Chertoff                          Date
Secretary of Homeland Security



_____          _____
John D. Negroponte                        Date
Director of National Intelligence


15

Robert S. Mueller, III
Director, Federal Bureau of Investigation

Date

John Scott Redd
Director, National Counterterrorism Center

Date

_Michael V. Hayden_
Gen. Michael V. Hayden
Director, Central Intelligence Agency

27 Apr '07
Date

Richard S. Kopel
Acting Director, Terrorist Screening Center

Date

16

The foregoing represents the understanding reached by the Parties.

**APPROVED BY**:


_____
Condoleezza Rice
Secretary of State

_____
Date


_____
Henry M. Paulson, Jr.
Secretary of the Treasury

february 2, 2007
Date


_____
Alberto R. Gonzales
Attorney General

_____
Date


_____
Robert M. Gates
Secretary of Defense

9-19-07
Date


_____
Michael Chertoff
Secretary of Homeland Security

_____
Date


_____
John D. Negroponte
Director of National Intelligence

_____
Date


15