**Nadhira F. Al-Khalili (VSB #46603)**
**THE COUNCIL ON AMERICAN-**
**ISLAMIC RELATIONS**
**453 New Jersey Avenue, South East**
**Washington, D.C. 20003**
**Telephone: (202) 646-6034**
**Facsimile: (202) 488-3305**
**Email: nalkhalili@cair.com**

**Gadeir Abbas (VSB #81161)**
**THE COUNCIL ON AMERICAN-**
**ISLAMIC RELATIONS**
**453 New Jersey Avenue, South East**
**Washington, D.C. 20003**
**Telephone: (202) 742-6410**
**Facsimile: (202) 488-0833**
**Email: gabbas@cair.com**

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| GULET MOHAMED | ) |
|     Plaintiff | ) |
| v. | ) |
| ERIC H. HOLDER, JR., in his official capacity as Attorney General of the United States; | ) |
| ROBERT S. MUELLER, III, in his official capacity as Director of the Federal Bureau of Investigation; | ) |
| TIMOTHY J. HEALY, in his official capacity as Director of the Terrorist Screening Center; | ) |
| Unknown Agents, in their individual capacity; and | ) |
| Unknown TSC Agents, in their individual capacity. | ) |
|     Defendants | |

CASE NO.:  1:11-cv-00050

HON.: JUDGE TRENGA

**SECOND AMENDED COMPLAINT**

**FOR DAMAGES AND INJUNCTIVE AND DECLARATORY RELIEF**

**(Violation of Fourth, Fifth, and Fourteenth Amendment Rights, the Torture Victim Protect Act, and the Administrative Procedure Act)**

JURY DEMAND

1

# INTRODUCTION

1.  Gulet Mohamed, an American citizen, was detained and tortured in Kuwait in 2010 at the behest of, due to the intentional actions of Defendants. After he was tortured, for over a week, he sought to return to the United States of America, but on January 16, 2011, he was denied boarding on an airplane to the United States.  Mr. Mohamed has returned to the United States, but he still suffers from the injuries to which Defendants subjected him.  Almost daily, he experiences symptoms of post-traumatic stress that originated from his detention and torture in Kuwait.  Mr. Mohamed is learning how to bear a burden that will last a lifetime, and Defendants are liable for these damages.

2.  Furthermore, Defendants' continued inclusion of Mr. Mohamed on the No Fly List substantially burdens his fundamental right to return and reside in the United States.  Mr. Mohamed has definite plans to leave the country.  As a citizen, Mr. Mohamed wants to know that Defendants will never again deprive him of his right to return to the United States.

3.  In the aftermath of Mr. Mohamed's return, Defendants have failed to provide him with a meaningful opportunity to rebut Defendants' conclusion—evinced by Mr. Mohamed's inclusion on the No Fly List—that he is a national security threat and thus unable to travel by plane.

# PARTIES

4. Plaintiff Gulet Mohamed is a nineteen year-old naturalized U.S. citizen.  He was born in Somalia and immigrated to the United States at the age of three.  Mr. Mohamed is a resident of Alexandria, Virginia.  On December 20, 2010, when Mr. Mohamed went to renew his Kuwaiti visitor's visa at an airport in Kuwait, he was detained by unknown assailants, tortured and

interrogated for more than one week.  He was then transferred to a deportation facility on December 28, 2010 where he awaited deportation back to the United States.  Despite Kuwait's desire to return Mr. Mohamed to the United States, Kuwait unsuccessfully tried to deport him via a flight back to the United States due to Defendants actions.  After this legal action commenced, Defendants allowed Mr. Mohamed to return to the United States.

5. Defendant Eric H. Holder, Jr. is the Attorney General of the United States and heads the Department of Justice ("DOJ"), a department of the United States government that oversees the Federal Bureau of Investigation ("FBI").  The FBI administers the Terrorist Screening Center ("TSC"), which was created to consolidate the government's approach to terrorism screening. The TSC develops and maintains the federal government's consolidated Terrorist Screening Database (the "watch list"), of which the No Fly List is a component.  Defendant Holder is sued in his official capacity.

6. Defendant Robert S. Mueller is Director of the Federal Bureau of Investigation which administers the TSC.  He is sued in his official capacity.

7.  Defendant Timothy Healy is the Director of the TSC and is sued in his official capacity.

8. Defendants Unknown Agents are the individuals who directed, facilitated, conspired, aided and/or participated in Mr. Mohamed's detention and torture in Kuwait.  Defendants Unknown TSC Agents are the individuals that placed Plaintiff on the No Fly List.

## JURISDICTION AND VENUE

9. This is a complaint for damages and injunctive and declaratory relief based upon civil rights and constitutional violations committed by the Terrorist Screening Center, Federal Bureau of Investigation, and U.S. Department of Justice in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and the Administrative Procedure Act.

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

11. The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Defendants are officers of agencies of the United States sued in their official capacity and because this judicial district is where Plaintiff Mohamed resides and where a substantial part of the events or omissions giving rise to the claim occurred.

## FACTUAL ALLEGATIONS

A.  The Federal Government's Terrorist Watch List

13.  In September 2003, Attorney General John Ashcroft established the Terrorist Screening Center to consolidate the government's approach to terrorism screening.  The TSC, which is administered by the FBI, develops and maintains the federal government's consolidated Terrorist Screening Database (the "watch list").  TSC's consolidated watch list is the federal government's master repository for suspected international and domestic terrorist records used for watch list-related screening.

14. TSC sends records from its terrorist watch list to other government agencies that in turn use those records to identify suspected terrorists.  For example, applicable TSC records are provided to the Transportation Security Administration ("TSA") for use by airlines in pre-screening

passengers and to U.S. Customs and Border Protection ("CBP") for use in screening travelers entering the United States.  Thus, while the TSC maintains and controls the database of suspected terrorists, it is the front-line agencies like the TSA that carry out the screening function.  In the context of air travel, when individuals make airline reservations and check in at airports, the front-line screening agency, TSA, or the airline, conducts a name-based search of the individual to determine whether he or she is on a watch list.

15. Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watch list—the National Counterterrorism Center ("NCTC") and the Federal Bureau of Investigation.  The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database.  The NCTC reviews TIDE entries and recommends specific entries to the Terrorist Screening Center for inclusion in the watch list.  TIDE is the source of all international terrorist identifier information included in the watch list.  The FBI, in turn, nominates to the watch list individuals with suspected ties to domestic terrorism.  TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watch list as a known or suspected terrorist and which screening systems will receive the information about that individual.

16. Defendant Healy, Director of the TSC, has testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watch list, the TSC determines whether the nominated individual is "reasonably suspected" of having possible links to terrorism.  According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be

or has been engaged in conduct constituting, in preparation for, in aid of or related to terrorism and terrorist activities."  Defendants have not stated publicly what standards or criteria are applied to determine whether an individual on the consolidated watch list will be placed on the No Fly List that is distributed to the TSA.

17. Under these standards, the number of records in the consolidated watch list has swelled to an estimated one million names, representing the identities and aliases of approximately 400,000 individuals.  Once an individual has been placed on the watch list, the individual remains on the list until the agency that supplied the initial information in support of the nomination determines that the individual should be removed.

18. A 2007 GAO report found that the TSC accepts almost 100 percent of nominations made to the watch list.

19.  In response to intelligence failures that permitted Nigerian citizen Umar Farouk Abdulmutallab, a would-be bomber, to fly from Amsterdam to Detroit on December 25, 2009, the Defendants have dramatically expanded the watch list as a whole and the No Fly List in particular.  At a recent Senate hearing, Russell E. Travers, Deputy Director of the National Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward on putting people on lists," and that the watch list is "getting bigger, and it will get even bigger."


B.  Inadequacy of Redress Procedure

20. The government entities and individuals involved in the creation, maintenance, support, modification, and enforcement of the No Fly List, including Defendants, have not provided

6

travelers with a fair and effective mechanism through which they can challenge their inclusion on the No Fly List.

21. An individual who has been barred from boarding an aircraft on account of apparent inclusion on the No Fly List has no clear avenue for redress, because no single government entity is responsible for removing an individual from the list.  The TSC, which is administered by the FBI, does not accept redress inquiries directly from the public, nor does it directly provide final disposition letters to individuals who have submitted redress queries.  Rather, individuals who seek redress after having been prevented from flying must complete a standard form and submit it to the Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP"). The DHS TRIP Program provides each individual with a "Redress Control Number" associated with the individual's report.  Yet it is the TSC that has responsibility for consulting with relevant agencies to determine whether an individual has been appropriately listed and should remain on the list.

22. Once TSC makes a determination regarding a particular individual's status on the watch lists, including the No Fly List, the front-line screening agency responds to the individual with a letter that neither confirms nor denies the existence of any terrorist watch list records relating to the individual.  The government does not provide the individual with any opportunity to confront, or to rebut, the grounds for his possible inclusion on the watch list.  Thus, the only "process" available to individuals who are prevented from boarding commercial flights is to submit their names and other identifying information to the Department of Homeland Security and hope that an unknown government agency corrects an error or changes its mind.

## PLAINTIFF'S ALLEGATIONS

23.   On or about March of 2009, Mr. Mohamed temporarily left the United States to learn Arabic and connect with members of his family living abroad.   His first destination was Sanaa, Yemen, where he studied Arabic for a few weeks.   However, out of concern for his safety given the instability of the country, he traveled to Somalia and stayed with relatives for several months. Finally, on or about August of 2009, he moved to Kuwait to continue his Arabic studies and stay with an uncle.   Mr. Mohamed entered each country lawfully and maintained lawful status for the duration of his travels abroad.

24.   Since Mr. Mohamed has been in Kuwait, he successfully renewed his visitor's visa twice. Both times, Mr. Mohamed went to a Kuwaiti airport, followed proper procedures, and received 90-day extensions for his visitor's visa without incident.

25.   On December 20, 2010, Mr. Mohamed went to the Kuwait International Airport, near Kuwait City, to renew his visa, just as he had done every three months since he arrived in Kuwait.   After an abnormally long wait of several hours, Mr. Mohamed contacted his brother in Virginia via email to inform him that the visa process was taking longer than usual.   This is the last communication anyone received from Mr. Mohamed for more than a week.

26.   While at the airport, two men in civilian clothes approached Mr. Mohamed, handcuffed him, blindfolded him, escorted him to a waiting SUV, and drove him to an undisclosed location approximately fifteen minutes from the airport.   During Mr. Mohamed's abduction, he was repeatedly beaten and tortured by his interrogators.   Mr. Mohamed's interrogators struck him in the face with their hands regularly and in Mr. Mohamed's estimate more than a hundred times. The interrogators whipped his feet and other parts of his body with sticks.   Mr. Mohamed was

forced by his interrogators to stand for prolonged periods of time.  At one point, the interrogators threatened to run currents of electricity through Mr. Mohamed's genitals.  In another instance, Mr. Mohamed's arms were tied to a ceiling beam and left in that position until he lost consciousness.

27.  Mr. Mohamed's interrogators inflicted these beatings, torture, and grave threats onto Mr. Mohamed for more than a week.  Mr. Mohamed remained blindfolded and handcuffed most of the time.

28.  The subject matter of the interrogators' questioning—communicated by one interrogator in perfect American English—indicates that Defendants Unknown Agents not only facilitated Mr. Mohamed's illegal detention, interrogation, and torture but participated directly.  The English speaking interrogator, Defendant Unknown Agent, asked Mr. Mohamed detailed questions about his American siblings, referencing non-public facts regarding his family.  For example, Defendant Unknown Agent knew the names, educational attainment, and chosen professions of several siblings. Defendant Unknown Agent indicated that he was aware that Mr. Mohamed's father was deceased.  Defendant Unknown Agent was also present and involved during a torture session.

29.  Furthermore, Mr. Mohamed was asked questions by Defendant Unknown Agent not about his actions within Kuwait but questions pertaining to individuals of particular interest to the United States.   It is highly implausible that Kuwaiti officials would ask such questions and torture an American citizen—in light of the dependent relationship Kuwait maintains with the United States—without the knowledge and approval of the United States.

30.   On Tuesday, December 28, 2010, Mr. Mohamed's interrogators transferred him to a deportation facility.   In this facility, Mr. Mohamed was placed with individuals awaiting deportation, receiving visits from family, and benefiting from the facility's reasonable treatment.

31.   At this deportation facility, Mr. Mohamed conversed with a prisoner who covertly kept a mobile phone in his cell.  Mr. Mohamed asked to use it, because his family still knew neither what happened to him nor his present location.  Mr. Mohamed made a call to his family, telling them where he was and what had happened to him.  He spoke with and retained one of his attorneys, Gadeir Abbas, soon after.

32.   Kuwaiti officials told members of Mr. Mohamed's family that they are holding him at the behest of the United States government and are willing to release him since they have no interest in keeping him in custody.   Kuwaiti officials attempted to deport Mr. Mohamed but told members of his family that the United States has placed him on the No Fly List which prevented his deportation.  Mr. Mohamed's placement on the No Fly List was confirmed by the United States in conversations reported in the press.

33.   On December 28, 2010, FBI agents visited Mr. Mohamed.  Once he informed them that he was represented by legal counsel in the United States and did not wish to answer their questions, the FBI agents suggested that they had some control over his detention by telling Mr. Mohamed that they could expeditiously procure his release from detention if Mr. Mohamed spoke to them. The agents told Mr. Mohamed that he would remain in detention indefinitely if he did not speak to them.

34.   On or about January 12, 2011, FBI agents again visited Mr. Mohamed.   Again, Mr. Mohamed informed the agents that he would not answer their questions without his lawyer

present.   The FBI agents persisted, asking him questions for several hours despite Mr. Mohamed's repeated entreaties for the interrogation to stop and essentially continuing the interrogation where Mr. Mohamed's torturers stopped.    The FBI agents threatened Mr. Mohamed with future interrogations, criminal charges, and during the interrogation the agents physically intimidated Mr. Mohamed by crowding him and yelling.   A Kuwaiti official intervened to calm the FBI agents down and request that the interrogation be brought to an end.

35.  On January 16, 2011, at the direction of Kuwaiti officials, Mr. Mohamed's family purchased a ticket for him back to the United States and delivered that ticket to Kuwaiti officials.  When Kuwaiti officials took Mr. Mohamed to the airport on January 16, 2010, however, Mr. Mohamed was not allowed onto the United Airlines flight.

36.   After this legal action commenced, Defendants allowed Mr. Mohamed to return to the United States on January 21, 2011.

## CLAIMS FOR RELIEF

### COUNT I

### VIOLATION OF U.S. CITIZENS' RIGHT TO RESIDE IN UNITED STATES AND TO REENTER THE UNITED STATES FROM ABROAD

### Right to Citizenship (Fourteenth Amendment)

37.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

38.   By the actions described above, Defendants, acting under color of law and through their agents, have deprived and continue to deprive Mr. Mohamed of his rights guaranteed by the Fourteenth Amendment of the United States Constitution.

39.  As a United States citizen, Mr. Mohamed has an absolute right to return to the United States from abroad.

40.  By placing Mr. Mohamed on the No Fly List while he was abroad, Defendants Unknown TSC Agents prevented Mr.  Mohamed from boarding an aircraft to return to the United States, even though no other means existed by which he may return to the United States, thus violating the constitutional rights of Mr. Mohamed.  Kuwaiti officials indicated that they were ready to deport Mr. Mohamed to the United States but were being prevented from doing so by Defendants Unknown TSC Agents.  Defendants Unknown TSC Agents knew or should have known that their actions violated Mr. Mohamed's clearly established citizenship rights.

41.  By maintaining Mr. Mohamed on the No Fly List, Defendants have substantially burdened his fundamental right to return to the United States in the immediate future.  Mr. Mohamed plans on again departing the United States to visit family in Somalia and complete a religious pilgrimage to Mecca, Saudi Arabia during the next two years, and Defendant Healy's overbroad actions substantially burden Mr. Mohamed's right to return to the United States.

## COUNT II

## UNLAWFUL AGENCY ACTION

### 5 U.S.C. §§ 702, 706

42. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

43.  Defendants' actions described herein were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional right and should

be set aside as unlawful pursuant to 5 U.S.C. § 706. Defendants' violations of Plaintiffs' constitutional and statutory rights constitute agency actions that are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity in violation of 5 U.S.C. § 706.

## COUNT III

### (VIOLATION OF THE TORTURE VICTIM PROTECTION ACT)

28 U.S.C. § 1350

44.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

45.   The acts described herein constitute a violation of the right not to be tortured under color of foreign law.  Violation of this right is actionable under the Torture Victim Protection Act, 28 U.S.C. § 1350.

46.   Defendants Unknown Agents are liable for Mr. Mohamed's torture in that acting in concert with unnamed Kuwaiti officials they conspired in and/or aided and abetted in bringing about the violations of Plaintiff's right not to be tortured under color of Kuwaiti law.

47.   As a proximate cause and/or direct result of Defendants unlawful conduct, Plaintiff has suffered physical harm, emotional distress, and economic loss.

## COUNT IV

## DENIAL OF SUBSTANTIVE DUE PROCESS

### Fifth Amendment: Substantive Due Process – Detention and Torture

48.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

49.   Defendants Unknown Agents conspired amongst themselves and/or aided and abetted Kuwaiti officials to detain Mr. Mohamed for the purpose of subjecting him to coercive custodial interrogation which amounted to torture.   In accordance with said agreements, Defendants Unknown Agents denied Mr. Mohamed access to counsel, the courts, and his consulate.   By entering into this agreement and /or aiding and abetting Mr. Mohamed's detention and torture, Defendant Unknown Agents intentionally subjected Mr. Mohamed to torture and coercive interrogation, taking his liberty without due process of law in violation of the Fifth Amendment of the Constitution.

50.   At the time Defendants Unknown Agents entered into said agreement, they were aware of the policy Kuwait maintains of state-sponsored torture but still ordered, facilitated, and as Mr. Mohamed believes, participated directly in Mr. Mohamed's detention and interrogation.   In doing so, Defendants Unknown Agents subjected Mr. Mohamed to torture and detention without due process of law in violation of the Fifth Amendment to the Constitution.

51.   As a proximate cause and/or direct result of Defendants unlawful conduct, Plaintiff has suffered physical harm, emotional distress, and economic loss.

## COUNT V

## VIOLATION OF RIGHT TO BE SECURE FROM UNREASONABLE SEIZURE

### Fourth Amendment

52.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

53.   Defendants Unknown Agents conspired amongst themselves and/or aided and abetted Kuwaiti officials to seize Mr. Mohamed without a warrant or probable cause of illegal activity. In accordance with said agreements, Defendants Unknown Agents denied Mr. Mohamed access to counsel, the courts, and his consulate.  By entering into this agreement and /or aiding and abetting Mr. Mohamed's seizure, Defendant Unknown Agents knowingly violated the Fourth Amendment's requirements.

54.   As a proximate cause and/or direct result of Defendants unlawful conduct, Plaintiff has suffered physical harm, emotional distress, and economic loss.

## COUNT VI

## DENIAL OF PROCEDURAL DUE PROCESS

### Fifth Amendment: Failure to Provide Post-Deprivation Notice and Hearing

55.   Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

56.   Defendants Healy and Mueller have failed to provide Mr. Mohamed with a meaningful opportunity to challenge his inclusion on the No Fly List, depriving him of his liberty interest in (1) traveling free from unreasonable burdens within, to, and from the United States, (2) being

free from false governmental stigmatization as an individual that poses a danger to air travel, (3) and nonattainder.

57.   By failing to provide Mr. Mohamed with a constitutionally sufficient legal mechanism for challenging his inclusion on the No Fly List, Defendants Healy and Mueller have deprived Mr. Mohamed of his constitutionally protected liberty interests without due process of law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

a. An injunction that:

i. requires Defendants to remedy the constitutional violations identified above, including the removal of Plaintiff from any watch list or database that unduly burdens his fundamental right to return to the United States

ii. requires Defendants to provide Plaintiff with meaningful notice of the grounds for his inclusion on a government watch list, and an opportunity to rebut the government's charges and to clear his name; and

b. A declaration that the actions of Defendants are illegal and violation Mr. Mohamed's constitutional and civil rights;

c.   An award of compensatory and punitive damages to Mr. Mohamed—determined in a jury trial—in an amount that is fair, just, and reasonable

d.   Awards attorneys' fees, costs, and expenses of all litigation.

16

e. Grants such other relief as the Court may deem just and appropriate

Respectfully submitted,


By:   _____/s/_____


**Nadhira F. Al-Khalili (VSB #46603)**
**THE COUNCIL ON AMERICAN-**
**ISLAMIC RELATIONS**
**453 New Jersey Avenue, South East**
**Washington, D.C. 20003**
**Telephone: (202) 646-6034**
**Facsimile: (202) 488-3305**
**Email: nalkhalili@cair.com**


By:   _____/s/_____


**Gadeir Abbas (VSB #81161)**
**THE COUNCIL ON AMERICAN-**
**ISLAMIC RELATIONS**
**453 New Jersey Avenue, South East**
**Washington, D.C. 20003**
**Telephone: (202) 742-6410**
**Facsimile: (202) 488-0833**
**Email: gabbas@cair.com**

17

## <u>CERTIFICATE OF SERVICE</u>

I certify that I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following counsel of record:


R. Joseph Sher, Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams United States Attorney's Building
2100 Jamieson Avenue,
Alexandria, VA 22314
Telephone: (703) 299-3747
Facsimile: (703) 299-983
Email: joe.sher@usdoj.gov



Respectfully submitted,


By: _____


Nadhira F. Al-Khalili (VSB #46603)
THE COUNCIL ON AMERICAN-
ISLAMIC RELATIONS
453 New Jersey Avenue, South East
Washington, D.C. 20003
Telephone: (202) 646-6034
Facsimile: (202) 488-3305
Email: nalkhalili@cair.com