UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

GULET MOHAMED,                           )
                                         )
                 Plaintiff,              )
                                         )
        v.                               )        No. 1:11-cv-50 (AJT/TRJ)
                                         )
ERIC H. HOLDER, JR., *et al.*,           )
                                         )
                 Defendants.             )
_____ )

## MEMORANDUM OPINION

In this action, plaintiff Gulet Mohamed has asserted a broad range of constitutional

and statutory claims arising out of his alleged physical abuse by Kuwaiti authorities with the

knowledge, approval and actual involvement of agents of the United States, and his inability

to board a return flight to the United States from Kuwait because of his placement on a "No-

Fly List" by American authorities. Joined as defendants are a number of specifically named

individuals, as well as certain "Unknown Agents" and "Unknown TSC Agents."

This matter is before the Court on a motion to dismiss plaintiff's Second Amended

Complaint ("SAC") filed by defendants Eric H. Holder, Jr., Attorney General of the United

States, Robert S. Mueller, III, Director of the Federal Bureau of Investigation ("FBI"), and

Timothy J. Healy, Director of the Terrorist Screening Center ("TSC") [Doc. No. 22], all of

whom plaintiff has sued in their official capacities only (collectively, the "Official Capacity

Defendants"). Upon consideration of the motion to dismiss, the memoranda and exhibits in

support thereof and in opposition thereto, and the arguments of counsel, the Court

concludes: (1) that plaintiff has not pleaded a legally cognizable claim against the Official

Capacity Defendants in so far as plaintiff's claims are based solely on his placement in the

1

Terrorist Screening Database ("TSDB") and on the No-Fly List; and (2) this Court is without subject matter jurisdiction over plaintiff's remaining claims against the Official Capacity Defendants or the Unknown TSC Agents named as defendants in the Second Amended Complaint. The Court will, therefore, dismiss plaintiff's claims based solely on his alleged placement in the TSDB and on the No-Fly List, and transfer the remaining claims against the Official Capacity Defendants and the Unknown TSC Agent defendants to the United States Court of Appeals for the Fourth Circuit pursuant to 28 U.S.C. § 1631. Plaintiff's remaining claims under the Torture Victim Protection Act, 28 U.S.C. § 1350, Fifth Amendment due process claims based on his alleged detention and torture, and Fourth Amendment unreasonable seizure claims against the defendant Unknown Agents are unaffected by this decision and shall remain in this Court.

## I.   BACKGROUND

### A.  Plaintiff's Factual Allegations

In March 2009, plaintiff, an American citizen, traveled from the United States to Yemen to learn Arabic. 2d. Am. Compl., ¶¶ 4, 30. After a brief stay in Yemen, plaintiff traveled to Somalia where he resided with relatives. 2d Am. Compl., ¶ 30.  In August 2009, plaintiff moved to Kuwait. 2d Am. Compl., ¶ 30.  Plaintiff resided in Kuwait without incident until December 20, 2010, when he was abducted from the Kuwait International Airport as he waited to renew his visa. 2d. Am. Compl., ¶¶ 31-33.  Plaintiff claims he was beaten, forced to stand for extended periods, threatened with more serious torture and even death, and interrogated by persons including an individual "who spoke American English" whom plaintiff alleges, upon information and belief, was an agent of the United States, after which he was placed in a Kuwaiti deportation facility. 2d Am. Compl., ¶¶ 32-42.  Plaintiff

alleges that he was interrogated by individuals who identified themselves as FBI agents, and was contacted by an official from the U.S. Embassy who encouraged plaintiff to speak with the FBI. 2d Am. Compl., ¶¶ 45-46. Ultimately, Kuwaiti officials attempted to deport plaintiff, but were unable to do so because plaintiff had been placed on a "No-Fly List" and was not permitted to board a United Airlines flight to the United States. 2d Am. Compl., ¶¶ 44, 47. According to media reports, unnamed "American officials … confirm[ed] that [plaintiff] is on a No-Fly list." 2d Am. Compl., ¶ 44; *see also* Mem. in Supp. of Emer. Mot. for TRO and/or Prelim Inj., Ex. D. [Doc. No. 4-4]. After this legal action was commenced in January 2011, plaintiff was permitted to return to the United States. 2d Am. Compl., ¶ 48

### B. Plaintiff's Claims

The plaintiff asserts the following claims: (1) violation of plaintiff's Fourteenth Amendment right to citizenship (Count I); (2) "Unlawful Agency Action" under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* and 701 *et seq.* (the "APA") (Count II); (3) violation of the Torture Victim Protection Act, 28 U.S.C. § 1350 (Count III); (4) a Fifth Amendment due process claim based on plaintiff's alleged detention and torture (Count IV); (5) violation of plaintiff's Fifth Amendment due process rights to post-depravation notice and hearing (Count V); and (6) violation of plaintiff's Fourth Amendment right to be free from unreasonable seizures (Count VI). In the SAC, plaintiff largely fails to clearly identify which claims are asserted against which defendants, or, as to those claims which appear to be asserted against the Official Capacity Defendants, what factual allegations plaintiff relies upon in support of his claims. Despite these ambiguities, it appears to the Court that plaintiff's claims in Counts I, II and V are directed toward the

Official Capacity Defendants, and the Court will analyze these claims as if they were asserted against each of the Official Capacity Defendants.

### C. **Procedural History**

Plaintiff filed this lawsuit on January 18, 2011 (at which time he remained in Kuwaiti custody), along with an emergency motion for a temporary restraining order and preliminary injunctive relief with respect to his inability to board a return flight to the United States [Doc. Nos. 1 & 3]. Plaintiff's initial Complaint and subsequent Amended Complaint named only the Official Capacity Defendants as defendants based on asserted violations of the Fourteenth Amendment (through 42 U.S.C. § 1983) and the APA. The Court held a hearing on January 18, 2011, on plaintiff's emergency motion, which was continued to January 20, 2011, based on the representations of the United States that it expected that the plaintiff would, in fact, be permitted to board a return flight to the United States. On January 20, 2011, the United States informed the Court that plaintiff was scheduled to arrive the following morning; and plaintiff in fact returned to the United States on January 21, 2011, rendering plaintiff's emergency motion moot.

On March 21, 2011, the Official Capacity Defendants filed their first motion to dismiss. Plaintiff opposed the motion on April 4, 2011, and a hearing was held on April 29, 2011, at which time the Court dismissed plaintiff's Amended Complaint with leave to amend. In its written Order issued in connection with its ruling [Doc. No. 19], the Court found that plaintiff failed to plead his legal theories or the factual bases of those theories with sufficient clarity, and, as a result, the Court could not properly assess the United States' arguments relating to standing, mootness, jurisdiction and exhaustion. The Court also directed the plaintiff to identify clearly in any subsequent amended complaint what security

procedures he was challenging, including whether he was challenging: (1) his placement in

the TSDB and the No-Fly List, and the absence or adequacy of the procedures pertaining to

the TSC's listing decision; (2) the implementation of the No-Fly List through the airlines;

(3) the Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP"),

or all three. The Court further ordered plaintiffs to clearly identify: (1) the facts plaintiff

contends establish standing and jurisdiction; (2) the legal rights that plaintiff contends were

violated and the source of those rights; (3) the specific cause of action, whether it be

pursuant to the APA, *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), the

Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, or otherwise; (4) the

facts that support a plausible claim to relief; and (5) the relief that plaintiff seeks.

In response to the Court's Order, plaintiff filed an unsigned version of the SAC on

May 20, 2011 [Doc. No. 20], and a signed corrected version of the SAC on May 24, 2011

[Doc. No. 21], which this Court will treat as the operative complaint. Although the SAC

fails to comply fully with the Court's April 29, 2011, Order, it appears based on what is

pleaded in the SAC and the subsequent briefing on the Official Capacity Defendants' motion

to dismiss the SAC that the plaintiff is challenging – as against the Official Capacity

Defendants – (1) his placement in the TSDB and No-Fly List, separate and apart from any

dissemination of that information; and (2) the dissemination of his name to the

Transportation Security Administration ("TSA") and to the media as a person listed on the

No-Fly List, along with the attendant consequences of his inability to fly in the past and

future, and reputational harms that may flow from the dissemination of his listing.

**D.  The Challenged Government Security Tools, Programs and Procedures**

Central to plaintiff's claims are the security tools, programs and procedures that have

been developed and implemented with respect to air travel.  These include: (1) the TSDB;

(2) the No-Fly List and Selectee List; (3) the Secure Flight Program; and (4) the DHS TRIP.

In support of their motion to dismiss based on lack of subject matter jurisdiction, the Official

Capacity Defendants submitted certain sworn declarations and other information pertaining

to the procedures and methods that are implicated in plaintiff's claims, which this Court may

and will consider at this stage of this proceeding.  *See Adams v. Bain*, 697 F.2d 1213, 1219

(4th Cir. 1982) (in resolving a motion to dismiss for lack of subject matter jurisdiction, "[a]

trial court may consider evidence by affidavit, depositions or live testimony without

converting the proceeding into one for summary judgment").

(1) The Terrorist Screening Database

Most of plaintiff's claims trace to his alleged inclusion in the TSDB as a suspected

terrorist.  The TSDB is the government's consolidated terrorist watchlist, and is maintained

by the TSC within the U.S. Department of Justice.  Piehota Decl., ¶ 6.  In order to be

included in the TSDB, "nominations" to the TSDB must satisfy "certain substantive

derogatory criteria establishing that the individual may be a known or suspected terrorist.

Whether the individual satisfies the substantive derogatory criteria is generally based on

whether there is reasonable suspicion to believe that a person is a known or suspected

terrorist." Piehota Decl., ¶ 12.

TSC personnel review nominations to the TSDB, and make determinations regarding

the sufficiency of the identifying information provided with the nominations and substantive

determinations regarding whether the nomination is substantively supported for inclusion in

the TSDB, the No-Fly and Selectee Lists.  Piehota Decl., ¶ 10.  TSA employees assigned to

and stationed at the TSC serve as "subject matter experts" regarding those individuals nominated to the No-Fly and Selectee Lists. Piehota Decl., ¶ 11. The TSC, through the TSDB, makes terrorist identity information accessible to various screening agencies and law enforcement entities by the regular "export" or distribution of updated subsets of TSDB data. Piehota Decl., ¶ 15.

### (2) The No-Fly List and Selectee List

The TSDB information is "exported" to the TSA for inclusion on the No-Fly and Selectee Lists. The No-Fly List is "a list of individuals who are prohibited from boarding an aircraft" and the Selectee List is "a list of individuals who must undergo additional security screening before being permitted to board an aircraft." Piehota Decl., ¶ 16. The TSA screens airline passengers and crew against the No-Fly and Selectee Lists pursuant to its Secure Flight Program. Giuliano Decl., ¶ 10.

### (3) The Secure Flight Program

The Secure Flight Program was enacted pursuant to the TSA's statutory responsibility to "use information from government agencies" to identify travelers who may pose a threat to national security or to civil aviation, so that it can "prevent [those] individual[s] from boarding an aircraft, or take other appropriate action with respect to [those] individual[s]." 49 U.S.C. § 114(h)(3). In this regard, the TSA must "compar[e] passenger information ... to the automatic selectee and No-Fly lists," 49 U.S.C. § 44903(j)(2)(C), and, in consultation with the TSC, "design and review, as necessary, guidelines, policies, and operating procedures for the collection, removal and updating of data maintained, or to be maintained, in the no fly and automatic selectee lists." 49 U.S.C. § 44903(j)(2)(E)(iii).

7

The Secure Flight Program requires aircraft operators to collect a passenger's full name, date of birth, gender and "Redress Number" (if applicable). Lynch Aff., at p. 2, fn. 1. This information, along with certain additional information, such as passport and reservation information, is referred to as Secure Flight Passenger Data ("SFPD"). 49 C.F.R. § 1560.3. The airlines are required to transmit this SFPD to the TSA. 49 C.F.R. § 1560.101(b). The TSA, in turn, compares this information against the information contained in its watch lists, including the No-Fly and Selectee Lists. Lynch Aff., at p. 2, fn. 1; *see also* 49 C.F.R. § 1560.1(b) ("This part enables TSA to operate a watch list matching program known as Secure Flight, which involves the comparison of passenger and non-traveler information with the identifying information of individuals on Federal government watch lists").

Airlines may not issue a boarding pass until they receive a response from TSA informing the airline of the results of the watch list matching process, and TSA provides the airlines with the government's determinations regarding which individuals may or may not board an aircraft. TSA's determinations are communicated by the TSA to the airlines through a "boarding pass printing result." 49 C.F.R. § 1560.105(b). The Secure Flight Program was fully implemented for all U.S. airlines on June 22, 2010, and all covered airlines on November 23, 2010. Lynch Aff., at p. 2, fn. 1.

(4) Department of Homeland Security Traveler Redress Inquiry Program

The Official Capacity Defendants have challenged plaintiff's ability to proceed in this Court with his claims based, in part, on his failure to exhaust the administrative review process that has been established for persons affected by the Secure Flight Program, known as DHS TRIP. Under DHS TRIP, if a traveler's complaint relates to data in the TSDB, the matter is referred to the TSC Redress Unit, which assigns the matter to a TSC redress

analyst. Piehota Decl., ¶ 29. The TSC does not, however, accept redress inquiries directly from the public.

If the complaining traveler is a direct match to an identity in the TSDB, the TSC Redress Unit provides copies of the complaint form and other relevant information to the agency that nominated the traveler to the TSDB and will work with the nominating agency to determine whether the traveler belongs in the TSDB. Piehota Decl., ¶¶ 29-30. After reviewing the information available and considering any recommendation from the nominating agency, the TSC Redress Unit makes the determination whether the passenger's information should remain in the TSDB or be modified or removed, and verifies that any appropriate changes are made by screening and law enforcement systems that rely on TSDB data, such as the No-Fly and Selectee Lists. Piehota Decl., ¶ 31.

After the TSC Redress Unit makes its decision, the TSA is notified of the decision. The TSA may send a determination letter to the traveller, but such a letter would not reveal the traveler's status on the TSDB or what actions, if any, were taken in response to the traveler's complaint. Piehota Decl., ¶ 32; *see also* Lynch Decl., ¶¶ 8-12.

## II.   ANALYSIS

The Official Capacity Defendants challenge this Court's jurisdiction to hear plaintiff's claims on the grounds that such jurisdiction lies exclusively in the Court of Appeals under 49 U.S.C. § 46110. In order to rule on the Official Capacity Defendants' motion to dismiss, the Court must first decide whether plaintiff has stated a cause of action with respect to the challenged conduct, and if so, whether that claim is within the scope of the exclusive jurisdictional grant contained in Section 46110.

A. **Relevant Jurisdictional Framework**

49 U.S.C. § 46110(a) provides:

> [A] person disclosing a substantial interest in an order issued by
> the [TSA] may apply for review of the order by filing a petition
> for review in the United States Court of Appeals for the District of
> Columbia Circuit or in the court of appeals of the United States
> for the circuit in which the person resides or has its principal place
> of business.

Section 46110(c) provides in relevant part that the courts of appeal have "exclusive

jurisdiction to affirm, amend, modify, or set aside any part of the [TSA] *order*." 49 U.S.C. §

46110(c) (emphasis added). Courts have given a broad construction to the term "order" in

Section 46110 and its predecessor statute. *See e.g. Gilmore v. Gonzalez*, 435 F.3d 1125,

1132 (9th Cir. 2006). The term "order" has been defined as a "decision which imposes an

obligation, denies a right, or fixes some legal relationship." *Id.* at 1133; *see also Latif v.*

*Holder*, 10-cv-750, 2011 U.S. Dist. LEXIS 47263, at * 9-10 (D. Or. May 3, 2011) (applying

*Gilmore*); *Scherfen v. United States Dept. of Homeland Sec.*, 3:CV-08-1554, 2010 U.S. Dist.

LEXIS 8336, at *31-33 (M.D. Pa. Feb. 2, 2010) (TSA letters that reflect a final

determination that "fixes some legal relationship" are TSA orders for purposes of Section

46110). Under Section 46110, the Court of Appeals has exclusive jurisdiction over

challenges to a final TSA order. Courts have extended that jurisdiction to other claims that

are "inescapably intertwined" with review of such orders. *See e.g. Scherfen, 2010 U.S. Dist.*

*LEXIS 8336, at 33-38; Dresser v. Ingolita*, 307 Fed. Appx. 834, 842-43 (5th Cir. 2009)

(holding that plaintiff's *Bivens* claims were "inescapably intertwined with a review of the

procedures and merits surrounding" the orders at issue); *Merritt v. Shuttle, Inc.*, 187 F.3d

263, 270-72 (2d Cir. 1999) (same); *see also Ibrahim v. Dept. of Homeland Sec.*, 538 F.3d

1250, 1259-1261 (9th Cir. 2008) (Smith, J., dissenting).

## B. Plaintiff's Substantive Claims

Plaintiff's claims can be broadly categorized as: (1) constitutional and reputational claims under the APA and the Due Process Clause of the Fifth Amendment as a result of plaintiff's placement in the TSDB and on the No-Fly List; and (2) claims under the Fourteenth Amendment, the APA, and the Fifth Amendment as a result of the restrictions on his ability to travel, including return travel to the United States, imposed by his placement on the No-Fly List.

The applicability of Section 46110 is to be judged by reference to the substance of plaintiff's claims, not his characterization of those claims as something other than the review of a TSA order. *See e.g. Dresser*, 307 Fed. Appx. at 842-43 (finding lack of jurisdiction to hear *Bivens* action); *Meritt*, 187 F.3d at 270-72 (same). For that reason, the Court must decide, particularly in light of the substantial due process issues that those claims raise, whether these challenges are so related to the challenge of a TSA order that they are within the scope of Section 46110 or whether plaintiff has alleged a sufficiently independent cognizable injury, separate and apart from any TSA order that may relate to or issue out of the challenged conduct.[1]

---

[1] A related issue is whether plaintiff has sustained an injury sufficient for Article III standing, which requires: (1) injury in fact that rises to the level of "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical;" (2) causation, *i.e.,* that there be a "causal connection between the injury and the conduct complained of" which is "fairly . . . trace[able] to the challenged action of the defendant;" and (3) that the injury is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotation marks omitted); *Friends of the Earth, Inc. v. Gaston Cooper Recycling Corp.*, 629 F.3d 387, 396-97 (4th Cir. 2011). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs, Inc.*, 528 U.S. 167, 185 (2000). Because the elements of this standing requirement are largely imbedded in the determination whether plaintiff has stated a cognizable constitutional tort claim, whether plaintiff has pleaded an actionable constitutional tort claim based on his reputational

(1) <u>Placement in the TSDB and on the No-Fly List</u>

Plaintiff contends that he suffered a cognizable constitutional deprivation once his name was included in the TSDB and No-Fly List without any pre-listing notice or opportunity to be heard, and without any information concerning the factual basis for placing him in the TSDB or on the list, even without any further dissemination to TSA or any other agency. Since a TSA order issues only after the name of a person on the No-Fly List is disseminated from the TSDB to the TSA and a person is actually prevented from flying only after the TSA disseminates the No-Fly directive to the airlines through the boarding pass printing result, the Court concludes that plaintiff's claim based solely on his listing is not sufficiently related to a TSA order to bring it within the scope of Section 46110. *Accord Ibrahim*, 538 F.3d at 1254-55 (Kozinski, C.J.). The Court must therefore determine whether plaintiff states a cognizable claim that can be adjudicated in this Court.

Plaintiff's position that his listing itself is actionable relies principally on *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951).  In *McGrath*, the Supreme Court addressed whether organizations that the Attorney General included on a list of groups designated by him as communist had a remedy based on alleged constitutional deprivations. The majority of the Court concluded that there was a justiciable controversy and that the organizations had standing to sue, albeit under a variety of different theories. *See id.* at 139-43, 157-59, 183-84.[2]  However,  the harm that was considered in *McGrath* flowed not

---

interests substantially merges with the Article III jurisdictional analysis, and it is not necessary to conduct a separate analysis of these claims in deciding the Official Capacity Defendants' motion to dismiss.

[2] Specifically, Justices Burton, Douglas, and Black found that organizations have standing to assert a right to operate free from what amounts to common law defamation, specifically, being branded as a communist or subversive. *Id.* at 139-43. Justice Frankfurter concluded

12

simply from an organization's inclusion on a list of subversive organizations (which the

dissent expressly found insufficient to deny them due process), but from the dissemination

of that list to the Loyalty Review Board and to government departments and agencies, which

then used the list to take actions against the organizations and their members, including the

revocation of the organizations' tax exemptions, the denial of certain licenses, and the

institution of discharge proceedings against disloyal federal employees. While the Supreme

Court splintered over the precise nature of the harm inflicted and the bases for and extent of

an available remedy, a majority of the Supreme Court anchored their decision on the harm

that was caused by the dissemination and use of the list, rather than the listing itself.

Following *McGrath*, no clear jurisprudence has developed concerning whether and

to what extent there are constitutional protections from internal, non-public government

listings based on a person's presumed threat to national security or public safety, without

some other conduct or consequence. The Fourth Circuit has recognized in at least one case a

"constitutional harm" based on the inclusion of defamatory information in a non-public

government file if there is a "likelihood" of dissemination to the public. *Sciolino v. City of*

*Newport News*, 480 F.3d 642, 650 (4th Cir. 2007); *but see Bishop v. Wood*, 426 U.S. 341,

384 (1976) (the due process clause of the Fourteenth Amendment is not implicated "when

there is no public disclosure" of the allegedly defamatory information and the defendant has

---

that the blacklisting violated the First Amendment and was in the nature of a Bill of
Attainder. Justices Black, Frankfurter and Douglas found that the kind of condemnation
implicit in the organizations' blacklisting would be barred under the Due Process Clause of
the Fifth Amendment without notice and a fair hearing. *Id.* at 143, 157-59. Justice Jackson,
by contrast, found that "mere designation as subversive deprives the organizations
themselves of no legal right or immunity," but that the harm to individual members of the
organizations at issue gave rise to an injury that would support standing. *Id.* at 183-84.
Justices Minton and Reed concluded that the blacklisting did not confer standing or
constitute a constitutional deprivation.

no otherwise legally recognized interest at stake). The Fourth Circuit has also made clear

that prospective victims of government defamation must have access to a pre-deprivation

process. *Sciolino*, 480 F.3d at 653 ("Fundamental to due process is an opportunity to be

heard – 'an opportunity which must be granted at a meaningful time' ... An opportunity to

clear your name after it has been ruined by dissemination of false, stigmatizing charges is

not 'meaningful'") (internal citation omitted); *but see also Matthews v. Eldridge*, 424 U.S.

319, 334-35 (1976) (explaining that "[d]ue process is flexible and calls for such procedural

protections as the particular situation demands" and requiring courts to consider: (1) the

private interest that will be affected by the official action; (2) the risk of an erroneous

depravation of such interest through the procedures used, and the probative value, if any, of

additional substitute procedural safeguards; and (3) the government's interest, including the

function involved and the fiscal and administrative burdens that additional or substitute

procedural requirements would entail). In *Sciolino*, however, the plaintiff was terminated

from his government employment, and the nexus between that termination and the plaintiff's

"stigmatic injury" clearly motivated and was at the heart of the court's analysis. *Compare*

*with Siegert v. Gilley*, 500 U.S. 226, 233 (1991) ("Defamation, by itself, is a tort actionable

under the laws of most states, but not a constitutional deprivation"); *Johnson v. Morris*, 903

F.2d 996, 999 (4th Cir. 1990) ("Publication of stigmatizing charges alone, without damage

to 'tangible interests such as employment,' does not invoke the due process clause" of the

Fourteenth Amendment).

Without minimizing the substantial liberty issues implicated by internal government

listings such as those represented by the TSDB and the No-Fly List, the Court concludes that

plaintiff must allege something more than only his inclusion in the TSDB and No-Fly List in

order to state a constitutional claim.  Here, plaintiff claims that his listing in the TSDB

constitutes a defamatory statement that he is or is suspected of being a terrorist.  But more

than a defamatory listing itself is necessary to state a claim.  Plaintiff has not alleged that his

name as someone listed on the TSDB or No-Fly List has or will be disseminated or used for

any purpose other than the implementation of the Secure Flight Program administered by the

TSA.  Nor is there one that the Court can reasonably infer.  Plaintiff does allege that his

listing on the No-Fly List was "leaked" to the *New York Times*, but that action is not alleged

to have been an official action, authorized as part of the official program administered by the

Official Capacity Defendants.  Rather, the plaintiff generally alleges that he has been injured

because the government's confirmation that he was placed on the No-Fly List means that the

government suspects plaintiff to be a terrorist, and that the government's determination

"encroaches upon [p]laintiff's reputational interests and interferes with his future personal

and professional relationships."  2d Am. Compl., ¶¶ 68-69.  These kinds of vague, non-

specific harms are not sufficient.  *See Ridpath v. Bd. of Governors*, 447 F.3d 292, 309 fn. 16

(4th Cir. 2006) (under the prevailing "stigma-plus" analysis, "no deprivation of a liberty

interest occurs when, in the course of defaming a person, a public official solely impairs that

person's *future* employment opportunities, without subjecting him to a *present* injury such

as termination of government employment") (emphasis original).  For these reasons, the

Court concludes that the plaintiff has failed to state a claim based solely on his alleged

inclusion in the TSDB and on the No-Fly List, and those claims will be dismissed.

(2) Plaintiff's Inability to Fly as a Result of His Inclusion on the No-Fly List

Plaintiff also contends that he has been injured by his placement on the TSDB and No-Fly List because of the consequences that flow from that placement, specifically, his past inability to return by air to the United States from Kuwait, and the impact on his ability to travel by air in the future. This claim also raises substantial constitutional issues, including the nature and scope of the alleged "right of return" to the United States.[3] While the answers to those issues may bear on whether the DHS TRIP provides adequate process, the key question before the Court is whether they sufficiently implicate a TSA order under Section 46110. The Court concludes that they do because an individual is personally affected in his ability to travel only after the issuance of the "boarding pass printing result" that instructs the airlines not to issue a boarding pass to a traveler on the No-Fly List.[4] This restriction on a traveller, communicated in the boarding pass printing result, is a TSA "order" because it imposes a legal obligation on the airline to deny a boarding pass to a putative passenger. For that reason, the Court concludes that the issues plaintiff raises with respect to his inability to fly are "inescapably intertwined" with TSA orders; and that this Court does not have subject matter jurisdiction over those claims, regardless of whether such a claim may procedurally be pursued as a *Bivens* claim, as an appeal of an arbitrary and

---

[3] The United States contends, briefly summarized, that a citizen's right to re-enter the United States does not extend to a right to return to the border by a specific means of travel, but rather extends only to the right to re-enter the country once a citizen actually presents himself at the border.

[4] Plaintiff's attempt to plead this injury in terms of a denial to purchase and utilize airplane tickets "in common with the rest of the citizenry," *see Paul v. Davis*, 424 U.S. 693, 708-09 (1973), does not change this analysis because the record before the Court does not suggest that plaintiff would be prevented from purchasing airline tickets, only that he was and would be prevented from boarding a flight by the TSA's Secure Flight Program.

16

capricious final agency order under the APA, or the subject matter for declaratory relief. Rather, the Court of Appeals is the correct forum in which to litigate these issues. *See e.g. Scherfen, 2010 U.S. Dist. LEXIS 8336, at 33-38; Latif,* 2011 U.S. Dist. LEXIS 47263, at *10-15; *Dresser,* 307 Fed. Appx. at 842-43; *Merritt,* 187 F.3d at 270-72; *Ibrahim v. Dept. of Homeland Sec.,* 538 F.3d at 1259-1261 (Smith, J., dissenting); *Gilmore,* 435 F.3d at 1133, fn. 9. As a result, the adjudication of plaintiff's claims that are based on his allegations that he was denied the right to board, or will be denied the right to board an aircraft, are vested in the Court of Appeals.[5]

### C. Administrative Exhaustion through DHS TRIP

Finally, the Court rejects the Official Capacity Defendants' position that plaintiff must exhaust whatever means of seeking redress he has through DHS TRIP before he can proceed either in this Court or the Court of Appeals. As noted above, there are substantial questions regarding whether this post-listing process is sufficient to satisfy due process

---

[5] The Official Capacity Defendants also take the position that any claims related to the DHS TRIP must also be addressed in the Court of Appeal. The adequacy of that program may bear on certain of the due process issues that the plaintiff has raised and which are in the jurisdiction of the Court of Appeals. However, proceedings pursuant to DHS TRIP do not necessarily require or result in an action that would qualify as a TSA "order," and specific challenges to DHS TRIP may or may not come within Section 46110. In this case, however, plaintiff has not identified a legally cognizable interest that is not inescapably intertwined with a TSA order, and the Court therefore expresses no view as to whether the process afforded through the DHS TRIP is adequate, either as a matter of constitutionally required due process or as compliance with the statutory mandate to afford an effective method of redress to someone who wishes to challenge his inclusion in the TSDB or No-Fly List. Likewise, the Court expresses no view concerning the substantial constitutional issues that relate to the restrictions on judicial review of governmental conduct imposed through Section 46110, particularly because the jurisdictional grant to the Court of Appeals is silent as to what information will be presented to the Court of Appeals as the record upon which it is to decide the issues committed to its exclusive jurisdiction, how and by whom that record is to be created, and what opportunity the plaintiff has to obtain relevant information for inclusion in that record. In any event, these are issues for the Court of Appeals.

requirements; and the Fourth Circuit has expressly declined to require the completion of an administrative decision making process where the "practical effect of the [agency's] determination" is to accomplish a deprivation before an established administrative appellate process is completed. *See e.g. Chamblee v. Espy*, 100 F.3d 15, 17-18 (4th Cir. 1996) (review appropriate under APA where practical effect of agency action was to suspend loan restructuring on which plaintiff relied to avert loss of interest in farm). This result is particularly appropriate here, where jurisdiction is vested in the Court of Appeals by virtue of an agency order, but no such order would necessarily issue as a result of the administrative process that the government contends plaintiff should be required to exhaust.[6] The Court therefore declines to prevent review of plaintiff's due process claims by recognizing an exhaustion requirement that may or may not be imposed by the Court of Appeals.

### D. <u>Transfer to the Court of Appeals</u>

Pursuant to 28 U.S.C. § 1631, if the Court "finds that there is a want of jurisdiction [over a civil action or appeal], the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed." In order to transfer a case pursuant to Section 1631: (1) there must be a lack of jurisdiction in the district court; (2) the transfer must be in the interest of justice; and (3) the transfer can be made only to a court in which the action

---

[6] Indeed, the record before the Court and the representations of counsel for the Official Capacity Defendants at oral argument reveal that any letter provided by the TSA at the conclusion of a DHS TRIP review is non-substantive, does not reveal whether an alteration in status has been accomplished, and has no substantive relationship to the TSC's review of a complaint by a listee. *See e.g.* Piehota Decl., ¶ 32; Lynch Decl., ¶¶ 8-12. Unlike a boarding pass printing result, which has a binding legal effect upon the airline receiving that order, the ultimate letter from the TSA does not affect a change in legal obligation, which, if at all, is accomplished by the TSC and is not communicated to the listee or an airline until another boarding pass printing result is issued.

could have been brought at the time it was filed or noticed. *Ukiah Adventist Hosp. v. FTC*, 981 F.2d 543, 549 (D.C. Cir. 1992). The statute confers upon the Court "authority to make a single decision upon concluding that it lacks jurisdiction -- whether to dismiss the case or, 'in the interest of justice,' to transfer it to a court of appeals that has jurisdiction." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818 (1988).

Here, the Court has determined that it does not have jurisdiction over the plaintiff's non-dismissed claims against the Official Capacity Defendants. The Court also concludes that it is in the interests of justice that the substantial and unresolved issues pertaining to plaintiff's claims against the Official Capacity Defendants be judicially addressed. The plaintiff resides within the Fourth Circuit and the Fourth Circuit has subject matter jurisdiction over plaintiff's remaining claims pursuant to 49 U.S.C. § 46110. The only remaining issue is the scope of the claims that may be transferred to the Court of Appeals.

At this time, the Official Capacity Defendants are the only defendants presently before the Court. Plaintiff, however, also asserts claims against the absent defendant "Unknown Agents" and "Unknown TSC Agents." At least one of these claims, Count I, appears to be asserted against a combination of Official Capacity Defendants and the Unknown TSC Agents, and relates to the denial of boarding. 2d Am. Compl., ¶¶ 49-53. Because the claims relate to the activities by which the TSC accomplished plaintiff's placement on the No-Fly List, plaintiff's remaining claims against these putative defendants would be inescapably intertwined with the TSA's order requiring the airline to deny plaintiff a boarding pass for the reasons discussed above, and such a claim is properly within the jurisdiction of the Court of Appeals. *See Dresser*, 307 Fed. Appx. at 842-43; *Meritt*, 187 F.3d at 270-72.

19

Counts III and IV, on the other hand, appear to be directed only toward the "Unknown Agents," and relate to plaintiff's torture claims, which are unrelated to any denial of boarding. 2d Am. Compl., ¶¶ 57-64. Similarly, Count VI appears to accuse the Unknown Agents with conspiring to cause Kuwaiti officials to seize plaintiff, and deny him access to counsel, the courts and his consulate, but does not allege unlawful detention in connection with his denial of a boarding pass during Kuwaiti officials' attempts to deport him. 2d Am Compl., ¶¶ 70-72. As such, these claims would not properly be within the jurisdiction of the Court of Appeals in the first instance pursuant to Section 46110.

Although the Fourth Circuit has not addressed the application of Section 46110 with respect to transfer under Section 1631, other federal circuits have concluded, albeit without reference to Section 46110, that Section 1631 permits the severance and transfer of less than an entire action. *See D'Jamoos v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 110-111 (3d Cir. 2009); *United States v. County of Cook*, 170 F.3d 1084, 1087-89 (Fed. Cir. 1999) (concluding that transfer of less than entire action is appropriate under Section 1631). However, at least one federal circuit has reached the opposite conclusion. *Hill v. United States Air Force*, 795 F.2d 1067, 1070-71 (D.C. Cir. 1986) (finding that Section 1631 "directs a court to transfer an 'action' over which it lacks jurisdiction, rather than an individual claim"). In this case, the underlying nature of plaintiff's claims extend beyond the issues to be addressed by the Court of Appeals and those claims over which this Court does have jurisdiction will be unaffected by the decisions of the Court of Appeals on the issues transferred to it. The Court, therefore, concludes under the specific circumstances presented in this case that it may, and should, transfer fewer than all of plaintiff's claims in this action to the Court of Appeals.

Accordingly, the Court will transfer to the United States Court of Appeals for the Fourth Circuit plaintiff's claims against the Official Capacity Defendants and the defendant Unknown TSC Agents that relate to plaintiff's inability to fly. Plaintiff's remaining claims against the defendant "Unknown Agents," Counts III, IV and VI, shall be unaffected by the transfer and remain in this Court.

## CONCLUSION

For the above reasons, the Official Capacity Defendants' motion to dismiss will be granted in part and denied in part. Plaintiff's claims against the Official Capacity Defendants based solely on plaintiff's alleged inclusion in the TSDB and No-Fly List will be dismissed. Plaintiff's remaining claims against the Official Capacity Defendants and the defendant Unknown TSC Agents will be transferred to the United States Court of Appeals for the Fourth Circuit. Plaintiff's remaining claims against the defendant Unknown Agents are unaffected and shall remain in this Court.

An appropriate Order will issue.

/s/

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 26, 2011

21