UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

GULET MOHAMED,

        PLAINTIFF,

v.

ERIC H. HOLDER, ET AL.,

        DEFENDANTS.

Case No. 1:11-CV-00050

## PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

    Plaintiff, Gulet Mohamed, by and through the undersigned counsel, hereby respectfully submits his Reply to Defendants' Opposition to Plaintiff's Motion to Compel.

### INTRODUCTION

    Although Defendants seek to dismiss Mohamed's case entirely based on an unjustified fear that state secrets will be disclosed, discovery has already yielded revealing information about the No Fly List and has done so without imperiling state secrets. We now know that in 2013, the Terrorist Screening Center (TSC) approved 98.96% of all nominations made to the Terrorist Screening Database (TSDB), a subset of the TSDB being the No Fly List. Doc. 91-3, 12. We also know that Defendants do not trust what their own records say, claiming that the "additional details about the basis for the rejection of a nomination" that Defendants' agents include in their records "cannot be considered to represent the actual basis for the decision." Doc. 91-3, 15. Defendants

1

position is that all it knows about why any nominations were rejected is the tautology that the nomination lacked "sufficient biographic information and sufficient derogatory information. *Id.*

The inadequacy of Defendants records is exactly what one would expect to exist behind the outward, public manifestations of the No Fly List, which operates as an abusive, accountability-free tool utilized by the FBI to impose a toll mostly on American Muslims who do not want to become informants.

Regardless, in addition to providing this revealing information, Defendants have also produced responsive documents, though not the critical ones Mohamed seeks. But despite the discovery dispute outlined below, the fact that discovery has been underway and that Defendants have partially responded undermines their concerns about state secrets being at risk and at the core of this case.

In short, Mohamed's discovery objectives are modest. He seeks to demonstrate that the risk of erroneous placement on the No Fly List is substantial, given the sloppiness of Defendants' records and the lack of internal scrutiny directed towards the substantive derogatory information upon which placement decisions are made. Mohamed also seeks to establish that the No Fly List is the productive of profiling—based on citizenship, national origin, and religion—to further show that the No Fly List includes US persons based on protected characteristics rather than criminal suspicion. And finally, Mohamed wants to assess the reasons Defendants reject nominations to show how cursory Defendants' nomination acceptance process really is, making it clear that the No Fly List is simply not narrowly tailored to its purpose.

Mohamed is seeking in discovery basic information with a flexible mindset. This Court should compel Defendants to fulfill the plain discovery requests Mohamed has made.

**ARGUMENT**

I. **The States Secrets Privilege Does Not Cover the Information Mohamed Seeks**

Defendants do not describe in any reasonable detail how their assertion of the state secrets privilege relates to particular discovery requests that Mohamed has made. Instead, Defendants assert the privilege *to the extent that it applies* over "categories of information" which include "subject identification," "reasons for investigation and results," and "sources and methods." Defendants Opposition, 14-15. Because Defendants have not itemized what parts of Mohamed's discovery requests to which they believe their state secrets privilege apply, Mohamed is in the position of having to reply at Defendants' level of generality.

    a. Disclosing Information that Regards Mohamed's Placement

First, Mohamed acknowledges that disclosing that someone is on the No Fly List may confirm that the government has identified them as an investigatory subject. And while Defendants suggest that revealing the "identities of counterterrorism investigations or intelligence activity" could "alert those subjects (or their associates) to the Government's interest in them…[and] put confidential informants or federal agents at risk," these concerns do not apply in the context of the No Fly List. Defendants Opposition, 15. This is because the No Fly List, the effects of which are revealed to listed persons when they attempt to travel, discloses the government's investigatory interest by design. Individuals on the No Fly List learn that they are so listed, because Defendants do not allow them to fly. Indeed, there is no other systematic reason why an American citizen could be prevented from flying over US airspace.

Furthermore, Defendants argument is particularly cynical, because the TSDB—of which the No Fly List is a subset—is a "sensitive but unclassified database and does not contain any derogatory information." Piehota Decl. Doc Entry 22-1, 16. Defendants disseminate the TSDB

to "22 foreign governments," airlines, and even ship captains. *See Latif v. Holder,* 2014 U.S. Dist. LEXIS 85450 (D. Or. June 24, 2014). Indeed, even Defendants' own declarations make clear that access to "TSDB data" does not "compromis[e] an investigation or intelligence collection methods. *See* Piehota Decl. Doc. 22-1, 7.

And persons on the No Fly List, just like Mohamed, are almost always told by FBI agents, airline employees, or Embassy officials that they are on the No Fly List. *Latif v. Holder* at *17 (Faisal Kashem "was told by an airline employee that he was on the No-Fly List"); *Id* at *18 (FBI agents told Elias Mohamed "that he was on the No-Fly List"); *Id.* at *19 (an FBI agent told Steven Washburn that he "would help remove Washburn's name from the No-Fly List if he agreed to speak to the FBI"); *Id.* at *21-22 (FBI agents told Ibraheim Mashal that "his name would be removed from the No-Fly List and he would receive compensation if he helped the FBI by serving as an informant"): *Id* at *22-23 (FBI agents offered Amir Meshal "the opportunity to serve as a government informant in exchange for assistance in removing his name from the No-Fly List"). *See also Fikre v. FBI,* 2014 U.S. Dist. LEXIS 73174 (D. Or. May 29, 2014) (Emirati officials told Yonas Fikre that he "could not travel to the United States by air because he is on the No-Fly List" and an FBI agent told Fikre that "the FBI could take steps to remove [him] from the No-Fly List if he agreed to be an informant").

There are innumerable other examples in the public domain and many more non-public examples, but the point is this: Defendants confirm status on the No Fly List all the time. Thus, in order to sustain their burden that disclosure of a person's No Fly List status "reasonably could be expected to cause significant harm to national security," this Court should demand that Defendants explain what damage to the national security was done by the above disclosures.

Additionally, the FBI allows "for the nomination of an individual for whom the FBI does not have an open terrorism investigation." *Audit of the Federal Bureau of Investigation's Management of Terrorist Watchlist Nominations (OIG Audit),* *ii*; DOJ, Office of the Inspector General, March 2014. [available at http://goo.gl/B6pBm1]. It could very well be the case that Mohamed could fit into Defendants' Orwellian category of No Fly List designees referred to as "non-investigative subjects." *Id.* And it is difficult to fathom how revealing the watch list status of a person who the FBI has chosen not to investigate would pose a risk to national security.

Because Defendants have not sustained their burden of showing that Mohamed's status on the No Fly List is subject to the state secrets privilege, this Court should compel Defendants to answer completely Interrogatory 1 and RFPD 11.[1]

### b. Disclosure of Watchlisting Guidance

Defendants also argue against the disclosure of "the Watchlisting Guidance" which, presumably, is responsive to RFPD 1, 3, and possibly 10. Defendants' Opposition, 16. While Mohamed acknowledges that there may be parts of the Watchlisting Guidance that could be withheld, he emphasizes that Defendants have previously made their Watchlisting Guidance available in response to an advocacy group's June 2011 Freedom of Information Act request. *See EPIC's FOIA Request for No Fly List and Selectee List Inclusion Criteria and Responsive Documents*, June 2011 [request available at http://goo.gl/Yff9GN and responsive documents available at http://goo.gl/aiENcD]. If Defendants can make their 2010 Watchlist Guidance, with some redactions, available via a FOIA request, this Court should demand from Defendants an

---

[1] For the same reasons articulated in the section, Defendants reliance on the law enforcement privilege is misplaced. In one key way, Defendants utilize the law enforcement privilege in a manner much more far reaching than they do the state secrets privilege. Defendants seek to shield, not only the "policies and procedures for implementing and maintaining the watchlists," but also the mechanism "by which redress is provided." Defendants' Opposition, 30. This Court should not credit Defendants argument that scrutiny over their abusive No Fly List "would weaken the Government's ability to proactively and effectively identify persons who should be watchlisted." *Id.* at 31.

explanation as to why national security would now be imperiled if something similar were to happen in response to Mohamed's discovery requests.

Additionally, because Defendants place persons who are not subject to investigations on the No Fly List, Mohamed should at least receive the standards that Defendants utilize to list such persons. *See OIG Audit* at 66 [available at goo.gl/Yff9GN] (explaining that as of March 2, 2012, "the FBI reported that the included 955 non-investigative subjects that it had nominated" but redacting the "three criteria…to be included on the watchlist as a non-investigative subject"). Defendants cannot credibly assert that disclosing standards that regard the inclusion of individuals who the FBI has chosen not to investigate would pose a risk to national security.

Furthermore, Defendants have yet to provide any information on what additional showing is required for persons nominated to the No Fly List. While Defendants have articulated the general standard for inclusion in the TSDB, they have not provided any information about the specific distinguishing criteria they apply to No Fly List nominations. Defendants offer no explanation as to why revealing such a standard would pose a reasonable risk to national security. Thus, this Court should compel them to respond fully to RFPD 1 and 3 to provide the documents that identify this.

    **c.**  Summaries as a Substitute for Any Information this Court Deems to be a State Secret

Because Mohamed was not provided Defendants' privilege logs, his arguments about having access to that information are necessarily general. With this in mind, however, Mohamed requests that this Court—to the extent that it believes the documents are actually state secrets—utilize procedures similar to the Classified Information Procedures Act to provide Mohamed with information relevant to his claims that also avoids the disclosure of state secrets. And while Defendants seek dismissal of Mohamed's claims based on their assertion of the state secrets

privilege, this Court can do what many other courts have done: structure a process whereby Mohamed's counsel can view sensitive information that is derived from state secrets without revealing them. In *Horn v. Huddle*, the court "weighed the risk to national security" concluded that "the risk of instituting [CIPA-like] procedures is minimal." *Horn v. Huddle*, 636 F. Supp. 2d 10, 19 (D.D.C. 2009). This Court can similarly institute a process whereby Mohamed's counsel can meaningfully engage in the material that Defendants have now begun to submit to this Court *in camera* and *ex parte.*

## II. Defendants Must Provide the TSDB-Related Information that They Have

   a. <u>Aggregate Demographic Characteristics about Persons in the TSDB are Relevant and Any Concerns about Burdensome Searches Can be Mitigated</u>

Defendants argue that the information Mohamed seeks about the citizenship and naturalization status, and religious affiliation "burdensome and unlikely to yield probative information." Defendants Opposition, 26. But Defendants are mistaken on both counts.

First, Mohamed's discovery requests have probative value and are based on this Court's guidance in its Memorandum Opinion. In order to examine what this Court referred to as the "possibility, if not probability, that determinations" about which individuals get onto the No Fly List are based on "constitutionally protected" activities, beliefs and associations, Mohamed sought to determine the place of birth, naturalization status, and perceived religion of US persons on the No Fly List. Mem. Opinion 19. These discovery requests include Interrogatories 4, 6, 7, 8, 9, and 10.

All public No Fly List incidences over the last several years that Plaintiff's counsel is aware of have regarded Muslim or Arab persons. Additionally, media reports almost always present travel to Muslim-majority countries as an event that closely precedes a person's placement on the

No Fly List. Mohamed wants to explore the probability that the US persons in the TSDB are ethnically similar, religiously alike, and share foreign origins in Muslim countries. If Mohamed can show that the TSDB is filled with US persons who fit a minority profile, it could show that Defendants' No Fly List is not narrowly tailored and thus a violation of Mohamed's substantive due process rights. Additionally, any indications that Defendants rely on national origin, ethnic, or religious profiling will also be the size of the risk of erroneous deprivation, which is relevant to Mohamed's procedural due process claim.

Similarly, Defendants' argument that these requests are burdensome because they do not track the national origin, citizenship status, and religion of listed persons. Although Defendants' Opposition now includes affidavits that give substance to their burdensome objections, they were not submitted to Mohamed when Defendants made their objections to his discovery requests. Had they been, Mohamed would have narrowed his request to seek only the national origin, citizenship status, and perceived-religion of US persons on the No Fly List, which likely number in the low triple digits. If this did not resolve a reasonable burdensome objection, Mohamed would have been open to a statistically sound sampling of the No Fly List records from which valid inferences could be drawn. In short, Defendants acknowledge that they have some information that regards national origin, citizenship status, and religious identity. However incomplete Defendants believe this information to be, the question for this Court is whether it is reasonably calculated to lead to the discovery of relevant information. It is, and this Court should compel Defendants to compile the information sought.

      b.   The Aggregate Reasons Defendants Reject TSDB Nominations Will Likely Show that Their Reviews of TSDB Records are Limited to Assessing Whether There is Sufficient Identity Information

Defendants make the bizarre argument that they cannot provide Mohamed an aggregate assessment of why TSDB nominations are rejected, though they acknowledge that the TSDB forms include a "free-form/text rject comment field" that "request some form of (unclassified) content" in the field to be entered for "all rejected nominations. Grigg Decl, Doc. 102-2, 28. Defendants claim that what it refers to as the "text reject comment field" does not actually "require that the *reason* for the rejection be specified." *Id.* Defendants say that this "comment-but-not-reason requirement" has "always been standard procedure." *Id.*

Discovery exists so that parties to litigation do not have to rely upon such implausible explanations. Mohamed wants to analyze these fields to determine whether Defendants ever reject nominations due to a "lack of minimum substantive derogatory criteria." *Id.* If they do not, then Mohamed will be able to demonstrate that the process by which Defendants place persons on the No Fly List is not rigorous and the "risk of erroneous deprivation" is substantial. And this information about why Defendants reject nominations exists, to a meaningful extent, in the forms Defendants have ready access to. This Court should compel Defendants to compile an assessment of the various reasons its personnel provide in that field.

III. **Mohamed's Counsel has been Cleared to View Sensitive Security Information**

Defendants claim that the reason they have withheld Sensitive Security Information, even though they know "Plaintiff's current counsel [has] passed background checks…pursuant to 49 C.F.R. § 1520.15(e)," is because no "protective order has been entered by the Court." This argument strains credulity as Mohamed's counsel has been very clear, as far back as March 21, 2014, that he would be happy to enter into a protective order to resolve issues regarding SSI. To

date, Defendants' counsel has not provided to Mohamed's counsel a draft of the protective order that they would seek to have this Court enter.

## CONCLUSION

For the above reasons, this Court should grant Plaintiff's Motion to Compel Defendants to answer and produce responsive documents.

Respectfully Submitted,

_/s/_____

Gadeir Abbas (VA Bar #81161)
THE COUNCIL ON AMERICAN-
ISLAMIC RELATIONS
453 New Jersey Avenue, SE
Washington, D.C. 20003
Telephone: (202) 742-6410
Fax: (202) 488-0833
Email: gabbas@cair.com
*licensed in VA; not in DC practice
limited to federal matters*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of July 2014 I caused the above to be sent electronically to all counsel of record.

/s/_____

Gadeir Abbas

(VA Bar #81161)