IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| GULET MOHAMED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:11-cv-50 (AJT/MSN) |
| | ) | |
| ERIC H. HOLDER, JR., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## MEMORANDUM OPINION

Plaintiff Gulet Mohamed (Plaintiff or "Mohamed") has challenged his alleged placement on the No Fly List. The No Fly List is a list of persons who are precluded from flying on commercial aircraft because they are suspected terrorists. Compiled by the Terrorism Screening Center (TSC) and enforced against travelers by the Transportation Security Administration (TSA) through commercial airlines, the No Fly List is intended to ensure aircraft safety as well as to restrict the ability of suspected terrorists to move freely in furtherance of terrorist activities, within the United States and internationally. Mohamed is an American citizen who was denied boarding on an international flight by an American carrier. He has not been convicted of, charged with or alleged to have committed a criminal offense related to terrorism or otherwise; and when applied to such an American citizen, the No Fly List represents, as the United States concedes, an unprecedented application of Executive branch authority in the name of national security through secret administrative proceedings based on undisclosed information according to undisclosed criteria.

This litigation centrally concerns what information must be made available to an American citizen in order to provide a constitutionally adequate opportunity to challenge a

placement on the No Fly List.  That constitutional inquiry presents unsettled issues that are
complicated in their resolution by the criteria used to compile the No Fly List and the classified
information that, of necessity, is used to determine whether a person satisfies that criteria.

Presently pending are the parties' cross-motions for summary judgment with respect to
Mohamed's claim in Count 3 of his Fourth Amended Complaint that he was denied a meaningful
opportunity to challenge his inability to fly on commercial aircraft, in violation of his Fifth
Amendment procedural due process rights. [1]  Specifically, Mohamed claims that he has not been
provided notice of his placement on the No Fly List, either before or after he was denied
boarding, or a meaningful opportunity to refute any derogatory information that was used to
place him on the No Fly List.  He claims, in effect, that he has been denied the opportunity to
establish that he poses no threat to commercial aviation.  He further claims that as result of these
constitutional violations, he has been denied his liberty interests in (1) traveling by air, (2) being
able to return to the United States after travelling abroad; and (3) being free from false
governmental stigmatization as a terrorist.  *See* Fourth Amended Complaint, Doc. No. 85, ¶ 64.

In their summary judgment motion, defendants claim that the Department of Homeland
Security's Traveler Redress Inquiry Program (DHS TRIP), the review process by which a person
denied boarding may request a review of his status, was constitutionally adequate, any
constitutional infirmities with that process have been cured through revised review procedures,

---

[1] The Fourth Amended Complaint sets forth three causes of action titled: (1) Violation of U.S.
Citizens' Right to Reside in United States and to Reenter the United States from Abroad in
violation of the Fourteenth Amendment (Count 1 – Right to Citizenship); (2) Unlawful Agency
Action in violation of 5 U.S.C. §§ 702, 706 (Count 2 – Unlawful Agency Action); and (3)
Failure to Provide Pre or Post Deprivation Notice and Hearing in violation of the Fifth
Amendment (Count 3 – procedural due process).  The Court previously dismissed Count 1 in
part as it related to Plaintiff's specific claim that he was unconstitutionally denied reentry into
the United States in January 2011.  *See Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D.Va.
2014).

and Mohamed's procedural due process claims are therefore moot.  They also contend in the

alternative that should the Court not grant summary judgment in their favor, Mohamed's

procedural due process claims should nevertheless be dismissed on the basis of the state secrets

privilege.  Doc. No. 159.

   For the reasons stated herein, the defendants' Motion for Partial Summary Judgment is

DENIED and Plaintiff's Motion for Partial Summary Judgment as to Count 3 is GRANTED in

part and DENIED in part.  Briefly summarized, the Court first concludes that DHS TRIP, as that

process existed at the time that Mohamed was denied boarding, did not provide a constitutionally

adequate opportunity to challenge his denial of boarding.  Second, after a review of documents

and information submitted by the defendants *in camera* and *ex parte*, the Court concludes that

there is no information protected from disclosure under the state secrets privilege that is

necessary either for Mohamed to establish liability under his procedural due process claims or

for the defendants to establish an available defense to that claim.  Third, based on the current

record, the Court cannot conclude as a matter of law whether the revised DHS TRIP process now

available to Mohamed is constitutionally adequate.

   The Court further concludes that the constitutional adequacy of the revised DHS TRIP

cannot be made until after Mohamed requests a review of his status under that revised process,

the TSC and TSA respond, and an administrative record is compiled that allows a reviewing

court to assess, to the extent it deems appropriate:  (1) whether Mohamed has received notice

that he is, in fact, on the No Fly List; (2) if on the No Fly List, the level of factual detail provided

to Mohamed concerning  the reasons for his inclusion on the No Fly List, including whether he

has been provided the specific criteria relied on and the specific factual findings used to satisfy

that specific criteria; (3) whether the factual information provided allow a reasonable opportunity

to rebut any derogatory information used for his placement on the No Fly List; (4) what factual

information was withheld from Mohamed concerning the reasons for his inclusion, the reasons

for withholding that information and whether additional material information could have been

provided, either directly or through alternative means, such as summaries or redacted documents;

(5) what information Mohamed provided or had an opportunity to provide, and in what form,

including whether he appropriately responded to any specific requests for information; and (6)

whether Mohamed's status is at the appropriate level of security restrictions for the level of

threat sufficiently established by that administrative record.

## I. Background

The factual and procedural history of this case are set forth in detail in this Court's

January 22, 2014 Memorandum Opinion. *See Mohamed v. Holder*, 995 F. Supp. 2d 520, 522-27

(E.D.Va. 2014).

Briefly summarized, Mohamed is a U.S. citizen of Somali descent, who alleges that in

2009, at the age of 16, he temporarily left the United States to travel to Yemen, Somalia and

Kuwait in order to meet family, study Arabic and attend school. Beginning on December 20,

2010, Kuwait authorities detained him at a deportation facility, during which time he alleges he

was interrogated, beaten and tortured. FBI agents visited him twice at the deportation facility,

once on December 28, 2010 and again on January 12, 2011. On January 16, 2011, Mohamed's

family purchased a ticket for him to return to the United States at the suggestion of Kuwaiti

officials, who delivered the ticket to Mohamed and transported him to the airport, where he was

denied boarding. On January 18, 2011, Mohamed filed this action against the defendants, which

include the heads of the Department of Justice (DOJ), Federal Bureau of Investigation (FBI),

Terrorist Screening Center (TSC), Department of Homeland Security (DHS), and the

Transportation Security Administration (TSA) (hereafter "the defendants"), seeking, *inter alia*, emergency relief to return to the United States. Doc. No. 1. On January 20, 2011, the defendants advised the Court that arrangements had been made for Mohamed to return to the United States. Mohamed returned to the United States via commercial airliner on January 21, 2011.

The process for inclusion on the No Fly List has also been discussed in previous opinions.[2] *See Mohamed v. Holder*, No. 1:11-CV-50 AJT/TRJ, 2011 WL 3820711, at *10 (E.D. Va. Aug. 26, 2011); *Mohamed v. Holder*, 995 F. Supp. 2d 520, 525-27 (E.D.Va. 2014). Briefly summarized, the Terrorist Screening Center ("TSC") is responsible for maintaining the Terrorist Screening Database (TSDB), of which the No Fly List is a subset. The standard for inclusion in the TSDB is "reasonable suspicion to establish that the individual is a known or suspected terrorist." Doc. No. 158-1, Grigg Decl. at ¶ 15. The defendants have alternatively phrased this standard as "known or appropriately suspected to be or to have engaged in conduct constituting, in preparation for, in aid of, or related to terrorism." Doc. No. 158-2, Declaration of Michael Steinbach, Assistant Director of FBI Counterterrorism Division, at ¶ 12. *See* HSPD-6. Certain government agencies may nominate individuals to be included on the TSDB. Nominations must

---

[2] Congressional authorization for the No Fly List has been limited. Following 9/11, Congress directed that the TSA, "in consultation with other appropriate Federal agencies and air carriers, establish policies and procedures requiring air carriers (A) to use information from government agencies to identify individuals on passenger lists who may be a threat to civil aviation or national security; and (B) if such an individual is identified, notify appropriate law enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual." 49 U.S.C. § 114(h)(3). It mandated, however, that DHS "shall establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by the Transportation Security Administration, United States Customs and Border Protection, or any other office or component of the Department of Homeland Security." 49 U.S. § 44926(a). DHS is also required to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system." 49 U.S. 44903(j)(2)(C)(iii). DHS TRIP was established by the Executive branch in response to these congressional mandates.

be supported by sufficient identifying information as well as substantive criteria, also known as "derogatory information."

To be included on the No Fly List subset, there must be a reasonable suspicion that the individual meets additional, heightened derogatory criteria beyond that required for inclusion in the TSDB, namely, reasonable suspicion that the individual is a known or suspected terrorist based on meeting one of the following criteria:

> The individual poses a threat of (1) committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft; (2) committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland; (3) committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations, U.S. ships, U.S aircraft, or other auxiliary craft owned or leased by the U.S. Government; or (4) engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

Doc. No. 158-1, Declaration of G. Clayton Grigg, Deputy Director for Operations of TSC, at ¶ 18. The reasonable suspicion must be supported by "articulable" intelligence and must be based on the "totality of circumstances" and intelligence reviewed.

Over the course of the litigation, defendants have filed several motions to dismiss this action in its entirety on a variety of grounds. *See* Doc. Nos. 10, 22, 58 (challenging Mohamed's standing to bring the action, the Court's jurisdiction over the action, and the legal sufficiency of Mohamed's allegations). With respect to jurisdiction, by Order dated August 26, 2011, the Court dismissed certain claims and transferred others to the Fourth Circuit Court of Appeals on the grounds that the Fourth Circuit Court of Appeals had exclusive jurisdiction pursuant to 49 U.S. C. §49110(a). *See Mohamed v. Holder*, No. 1:11-CV-50 AJT/TRJ, 2011 WL 3820711, at *10 (E.D. Va. Aug. 26, 2011). On May 28, 2013, the Fourth Circuit concluded that its exclusive jurisdiction pursuant to 49 U.S. C. §49110 did not extend to claims and remedies against TSC

and remanded the case for further proceedings. Doc. No. 45.[3]  On January 22, 2014, following

that remand, the Court held that Mohamed had standing to bring his remanded claims and that

his remanded claims were ripe for review, despite Mohamed's failure to request review of his

status under the DHS TRIP.  It also granted the defendants' motion to dismiss Mohamed's claim,

asserted in Count 1, that he was prevented from re-entering the United States in January 2011in

violation of his constitutional right of return to the United States. It denied the motion to dismiss

any remaining substantive due process claims in Count 1, his Administrative Procedure Act

claim in Count 2, and his procedural due process claims in Count 3.  995 F. Supp. 2d. at 539.

On May 28, 2014, the defendants filed a motion to dismiss the case in its entirety based

on their invocation of the state secrets privilege. *See* Doc. Nos. 104-105. On September 15, 2014,

after reviewing the declarations of certain high level officials from the TSC, as well as the

Attorney General, the Court ordered the defendants to submit for *ex parte, in camera* review

those documents pertaining to the due process claims that they considered covered by the state

secrets privilege and law enforcement privilege.  Doc. No. 139.  The defendants complied and on

October 30, 2014, after reviewing those documents *in camera*, the Court concluded that those

documents were not "so related to [Mohamed]'s procedural due process claims as to prevent

either the plaintiff or the defendant from presenting or defending against those claims without the

use of any of [those] documents."  The Court therefore denied the defendants' motion to dismiss

Mohamed's procedural due process claims based on defendants' invocation of the state secrets

privilege.  Doc. No. 144. The Court specifically advised, however, that "to the extent that the

defendants contend during the actual adjudication of these claims, within the context of either

summary judgment or any evidentiary hearing, that it cannot adequately defend against such

---

[3] Its mandate became effective on July 22, 2013. Doc. No. 47.

claims without the use of a specific document claimed to be protected under the state secrets privilege, the Court will consider that claim in that specific context." *Id.*

On December 9, 2014, cross-motions for summary judgment were filed as to Mohamed's procedural due process claim. Doc. Nos. 158, 161. In their motion for summary judgment, defendants again invoked the state secrets privilege to dismiss the procedural due process claim as an alternative grounds for their summary judgment motion. On January 30, 2015, the Court heard oral argument on those cross-motions for summary judgment. Following that hearing, it scheduled an *ex parte, in camera* closed hearing "to provide the defendants with the opportunity to provide and the Court to consider additional information concerning the defendants' claims concerning the existence of state secrets and their relevance to the pending procedural due process claims." Doc. No. 173. The Court also identified in that Order specific issues to be discussed in that closed hearing, which the Court held on March 17, 2015. *See Id.* at p. 2-3.[4]

---

[4] The Court identified the following issues to be discussed in closed session:

(1) state secrets or national security information the defendants may wish to present to the Court not reflected in the documents previously filed *ex parte, in camera* and under seal;

(2) how the under seal documents as to which the state secrets privilege is claimed precludes adjudication of the procedural due process claims without their use and disclosure;

(3) how the defendants apply the criteria for placement on the No Fly List consistent with the restrictions listed in its publically disclosed criteria;

(4) any criteria other than those publicly disclosed for the purposes of placing United States citizens on the No Fly List;

(5) how defendants distinguish between United States citizens that are placed on the No Fly List and those placed on the Selectee List and the need to have a level of security beyond those protections afforded through the Selectee List;

(6) whether, and if so, how national security considerations make it impractical or otherwise undesirable to submit for *ex parte, in camera* judicial review and approval the placement of United States citizens on the No Fly List, either before a citizen's placement on the No Fly List or within a specific time period after placement on the No Fly List; and

## II. Legal Standard

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958–59 (4th Cir.1996). The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir.2007). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 247–48. Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

---

(7) whether, and if so, how national security considerations make it impractical or otherwise undesirable for United States citizens who challenge their inability to board a commercial aircraft to receive information concerning their placement on the No Fly List under procedures comparable to those employed in criminal matters under the Classified Information Procedures Act ("CIPA"); and

(8) any other national security information that the defendants believe is necessary for the Court to consider in connection with its consideration of the procedural due process claims and any remedies that may be ordered with respect to any constitutional violations that the Court may ultimately find.

### III. Analysis

#### A. The Procedural Due Process Claim (Count 3):

In *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the Supreme Court outlined the applicable analysis for procedural due process claims as follows:

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*See also Hamdi v. Rumsfeld,* 542 U.S. 507, 529 (2004) ("The *Mathews* calculus [] contemplates a judicious balancing of these concerns, through an analysis of the risk of an erroneous deprivation of the private interest if the process were reduced and the probable value, if any, of additional or substitute procedural safeguards.") (internal citations omitted).

For the purposes of the *Mathews* constitutional analysis, the Court concludes that Mohamed's liberty interests implicated by any placement on the No Fly List are strong and the government's interest in protecting the safety of commercial aircraft is compelling. The Court also concludes that the administrative process used to place a person on the No Fly List has an inherent, substantial risk of erroneous deprivation, particularly with respect to a total exclusion through the No Fly List as opposed to heightened security screening through the Selectee List; and that additional procedures, other than those under DHS TRIP, as originally structured, would reduce the risk of erroneous placement on the No Fly List. [5]

---

[5] DHS TRIP, as it existed when Mohamed was denied boarding, provided no opportunity to learn of or rebut any derogatory information or, indeed whether that person was, in fact, on the No Fly List. Rather, when a person requested review of his status, DHS TRIP first determined whether

The Court previously wrote at length concerning the nature of these competing interests within the context of defendants' motion to dismiss Plaintiff's procedural due process claim. *See Mohamed v. Holder*, 995 F. Supp. 2d at 527-533, which is incorporated herein by reference. The District Court in *Latif v. Holder*, 28 F. Supp. 3d 1134 (D. Oregon 2014) has also analyzed the constitutional adequacy of the DHS TRIP process, as it existed at the time Mohamed was denied boarding and filed this lawsuit. The Court adopts that analysis and can only marginally add to it with respect to the following issues that remain relevant to an assessment of the revised DHS TRIP.

 1. Plaintiff's claimed travel related rights:

Central to the *Mathews* analysis in this case is the parties' dispute over the nature of the travel related liberty issues at stake. Mohamed refers to his right to travel as a "bundle of rights" that includes his right to "exit and return to the United States." Doc. No. 161 at p. 8. Mohamed asserts that the No Fly List has had the practical effect of preventing international travel. Defendants characterize Mohamed's liberty interest in international travel as "weak" and therefore subject to reasonable government regulation and subordinate to national security concerns. They distinguish international travel from the fundamental right to interstate travel, as recognized in *Saenz v. Roe*, 526 U.S. 489, 498 (1999) ("the 'constitutional right to travel from one State to another' is firmly embedded in our jurisprudence."). They point to decisions that have recognized that a traveler does not have a constitutional right to "the most convenient mode

---

the traveler's identity is an identity listed in the TSDB. If it were a match, the TSC Redress Unit then reviewed available information to determine whether the traveler is an exact match to a TSDB identity and whether the traveler's status should be modified or maintained. DHS TRIP then would send the traveler a determination letter, which did not disclose whether the traveler is in fact on the No Fly List or any reasons why the person may be on the No Fly List. The letter constituted final agency action subject to judicial review in the U.S. Court of Appeals pursuant to 49 U.S.C. § 46110.

of travel." *See, e.g., Gilmore v. Gonzalez*, 435 F.3d 1125, 1137 (9th Cir. 2006) (plaintiff "does not possess a fundamental right to travel by airplane even though it is the most convenient mode of travel for him."); *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) ("travelers do not have a constitutional right to the most convenient form of travel[, and] minor restrictions on travel simply do not amount to the denial of a fundamental right"); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) ("Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification.").

The general right of free movement is a long recognized, fundamental liberty. *See Kent v. Dulles*, 357 U.S. 116, 125 (1958) ("The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment"); *Zemel v. Rusk*, 381 U.S. 1, 15 (1965). *See also Kerry v. Din*, 135 S. Ct. 2128, 2133 (2015) (plurality opinion, Scalia, J) (referencing Blackstone's recognition that "the "personal liberty of individuals" protected under the Magna Carta "consist[ed] in the power of locomotion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint.").

Mohamed also has a protected liberty interest in traveling internationally. "Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic to our scheme of values." *Kent v. Dulles, supra*, 357 U.S. at 126. It must be recognized that a meaningful right of travel in today's world cannot be understood as cleanly divided between interstate and international travel or a right without any correlative rights with respect to the usual and available means in a modern society. To the extent courts have discussed the lack of

rights with respect to the "the most convenient mode" of transportation, they have done so, not within the context of a total ban, but with respect to reasonable regulations that still facilitated access and use. *See, e.g. Gilmore, supra,* 435 F.3d at 1137. Given the wide ranging impact on a person, previously discussed in this case, *see* 995 F. Supp. 2d at 528, the rights implicated by Mohamed's presumed placement on the No Fly List are strong and deserving of strong protections against unnecessary governmental restrictions.

       2. Plaintiff's Reputational Interests:

Coupled with Mohamed's travel related rights are his reputational interests and his claims of reputational harm. A person has certain rights with respect to governmental action that alters or extinguishes a right or status previously recognized by state law, known as a "stigma-plus." *Paul v. Davis,* 424 U.S. 693, 711 (1976). *See Evans v. Chalmers,* 703 F.3d 636, 654 (4th Cir. 2012) ("[A] plaintiff bringing a "stigma-plus" claim under *Paul* must allege both a stigmatic statement and a "state action that 'distinctly altered or extinguished' " his legal status."). The Court previously discussed "the broad range of consequences that might be visited upon such a person if that stigmatizing designation were known by the general public." 995 F. Supp. 2d at 529.

The Court has previously ruled that a person's listing on the No Fly List, in itself, does not infringe any protected liberty interest. *See Id.* at 528. There is also a substantial question whether the dissemination of the No Fly List within or among government agencies or to airlines, standing alone, would satisfy the public disclosure prong of a stigma-plus claim. [6] *See Johnson v. Martin,* 943 F.2d 15, 17 (7th Cir. 1991) (Intra- and inter-governmental communications are not public statements for the purposes of showing stigmatization); *Tarhuni*

---

[6] Mohamed points to the No Fly List's dissemination to agencies throughout the U.S. government, to 22 foreign governments, and to ship captains. Doc. No. 161 at p. 13.

*v. Holder*, 8 F. Supp. 3d 1253, 1275 (D. Or. 2014). Nevertheless, a person's placement on the No Fly List would likely become known over time to persons beyond government agencies or the airlines, with accompanying adverse consequences visited upon a restricted person. For example, any member of the general public who would actually witness a person being excluded from boarding might draw an adverse inference concerning that person's reputation. More likely to inflict reputational harm are other scenarios not hard to imagine where a person's inability to fly would become known to those outside of government and have adverse consequences, such as to a person's actual or prospective employer who would call upon that person to travel by air, or to extended family members whom a person might not be able to visit except through air travel, or to members of religious, professional or social organizations in which participation might require air travel. Thus, while Mohamed's constitutionally protected reputational interests are not as strong as his travel related interests, and both are subject to appropriate restrictions,[7] they underscore the need overall for strong procedural protections for Mohamed's travel related rights.

### 3. Pre-deprivation notice or judicial review.

Mohamed argues that the nature of the defendants' procedures will necessarily lead to mistaken determinations and erroneous placements on the No Fly List and that additional procedures would reduce that risk, without impairing legitimate governmental interests, even where there are national security concerns, reflecting the sentiments expressed in such cases as

---

[7] *See, e.g., Zemel, supra,* 381 U.S. at 15 (the petitioner's due process rights were not violated when the Secretary of State refused to validate his visa for travel to Cuba); *Haig v. Agee,* 453 U.S. 280, 306 ("the freedom to travel abroad with a . . . . passport issued by the sovereign is subordinate to national security and foreign policy considerations; as such, it is subject to reasonable governmental regulation."). *See also Califano v. Aznavorian,* 439 U.S. 170, 176-77 (1978) ("legislation which is said to infringe the freedom to travel abroad is not to be judged by the same standard applied to laws that penalize the right of interstate travel").

*Hamdi v. Rumsfeld,* 542 U.S. at 528 (holding unconstitutional the government procedures used to determine whether an American citizen may be detained as an "enemy combatant" since they did not sufficiently provide notice of the facts for that classification and an opportunity to rebut those factual assertions before a neutral decision maker); *Joint Anti-Fascist Refugee Comm. v. McGrath,* 341 U.S. 123, 171 (1951) (Frankfurter, J., concurring) ("Secrecy is not congenial to truth-seeking and self-righteousness gives too slender an assurance of rightness. No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it"); *Hernandez v. Cremer,* 913 F.2d 230, 238 (5th Cir. 1990) ("The extremely broad discretion delegated to the [government] concerning control over our nation's borders and the lack of any written guidelines regarding the exercise of that discretion render the decision-making process virtually standardless."); *Gete v. I.N.S.,* 121 F.3d 1285, 1297 (9th Cir. 1997) ("without knowing the exact reasons . . . as well as the particular statutory provisions and regulations they are accused of having violated, they may not be able to clear up simple misunderstandings or rebut erroneous inferences drawn by [the government]"); see also *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."). More specifically, Mohamed contends that under Fourth Circuit law some pre-deprivation process is required, relying on *Sciolino v. City of Newport News,* 480 F.3d 642, 652 (4th Cir. 2007), where the court ruled that a post-deprivation hearing is not sufficiently "meaningful" to allow a dismissed public employee to clear his name. *See also Rusu v. INS,* 296 F.3d 316, 321 (4th Cir. 2002) (asylum petitioners must be afforded an opportunity to be heard);

*Perry v. Norfolk*, No. 98-2284, 1999 WL 731100 (4th Cir. Sept. 20, 1999) (placement on child abuser registry must be preceded by notice and hearing). In response to these positions, the defendants contend that even under the pre-*Latif* DHS TRIP there are sufficient safeguards to make the risk of erroneous deprivation low since two agencies – the nominating agency and TSC – must review the nomination to ensure that there is sufficient supporting information, and the supporting information requires concrete, "appropriately restrictive" criteria to be met. *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 301 (1981). They further contend that any constitutional inadequacies in those procedures have been eliminated under the currently operating DHS TRIP.

The lack of any independent review of No Fly List placements by a neutral decision-maker, coupled with the limited disclosures and opportunity to respond by a person who requests that his status be reviewed, raise a substantial risk of erroneous deprivation, regardless of the internal procedures used to determine placement on the No Fly List. On the other hand, pre-deprivation notice and hearing would alert an individual, and through him or her, others, whom the government suspects of terrorist activity, and thereby compromise on-going investigations and endanger those persons involved in those investigations. *See Ibrahim v. DHS*, --- F.Supp.2d -
-, 2014 WL 6609111, at *18 (N.D. Cal. Jan. 14, 2014) ("the Executive Branch must be free to maintain its watchlists in secret, just as federal agents must be able to maintain in secret its investigations into organized crime, drug trafficking organizations, prostitution, child-pornography rings, and so forth. To publicize such investigative details would ruin them.").[8]

---

[8] The defendants point out that in 2013 "a substantial number of U.S. persons on the No Fly List never attempted to board a commercial aircraft" and the Court generally agrees with their assessment that such notice might cause suspects to "lower their profile, change their location, or take other countermeasures to avoid detection and circumvent surveillance," long before the

Given the effects pre-deprivation notice would have on the government's compelling interests, the Court concludes that a balancing of the respective interests does not weigh in favor of pre-deprivation notice. *See GRF v. O'Neill*, 315 F.3d 748, 754 (7th Cir. 2002) ("Risks of error rise when hearings are deferred, but these risks must be balanced against the potential for loss of life if assets should be put to violent use."). The Court therefore concludes that so long as post-deprivation notice and hearing are sufficiently robust, pre-deprivation notice and hearing are not constitutionally required. *See Gilbert v. Homar*, 520 U.S. 924, 930 (1997) ("on many occasions, [] where a State must act quickly, or where it would be impractical to provide pre-deprivation process, post-deprivation process satisfies the requirements of the Due Process Clause"); *Fields v. Durham*, 909 F.2d 94, 97 (4th Cir. 1990) (to determine whether a procedural due process violation has occurred, courts must consult the entire panoply of pre-deprivation and post-deprivation process provided by the state). *See also Holy Land Found. For Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156, 163-64 (D.C. Cir. 2003) (holding that pre-deprivation process is not constitutionally required within the context of immediate asset blocking to prevent financial assistance to terrorism); *but cf. Haramain Islamic Found. v. Dep't of Treasury*, 686 F.3d 965 (9th Cir. 2011) (where there are no national security concerns, OFAC must provide a Specially Designated Global Terrorist(SDGT) designee a "timely" statement of reasons for the investigation); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001) (absent adequate showing to the court that earlier notification would impinge on security and foreign policy goals, target organizations for Foreign Terrorist Organization (FTO) designation must receive pre-deprivation notice that they are under

---

government's interest in their activity might otherwise have come to their attention. Doc. No. 159 at p.17.

17

consideration for designation, the unclassified portions of the administrative record relied on in making the determination and an opportunity to rebut the administrative record).

The Court has also considered the constitutional need for pre-deprivation judicial review, or review by some other independent decision maker comparable, in effect, to those constitutionally required *ex parte, in camera* procedures associated with the Fourth Amendment's warrant requirement for searches and seizures. *See, e.g., United States v. Jones*, 132 S. Ct. 945, 947 (2012). Given the liberty interests at stake and the substantial and enduring impact a No Fly List placement has on those liberty interests, much recommends a pre-deprivation *ex parte, in camera* judicial review, either before or within a reasonable time after a person is listed on the No Fly List. For example, unlike a Title III wiretap, or GPS vehicle tracking, the No Fly List represents the imposition of an open ended disability, the effects of which can be far reaching and not undone easily, even after one is removed from the List. The prospects for disclosure through that sealed process to affected individuals would be exceptionally low.

The defendants strongly object to pre-deprivation judicial review principally on the grounds that it would distract them from their mission and compromise their ability to best assess and protect against terrorists threats. But the Court sees in the substance of many of their objections claims that reduce to administrative inconvenience and insufficient resources, and a concern that such oversight would induce an undesirably cautious approach to No Fly List placement. *See* Doc. No. 184-1, Declaration of Michael Steinbach, Assistant Director of the Counterterrorism Division, FBI, at ¶¶ 8-10, 13-16 (describing the "significant burden" of judicial approval, either before placement or soon after, would impose, including "hinder[ing] the FBI's ability to act quickly to address and possibly prevent threats, and shifting the "focus of concern"

18

away from "making predictive judgments as to the risk a person may pose," to "whether the basis of the determination would be clear to a judicial officer, who lacks similar expertise"). The Court is not in a position to assess adequately the merits of many of defendants' objections. In any event, and notwithstanding that pre-deprivation judicial review would effectively address many of the substantial objections to a placement on the No Fly List, there is no express statutory authorization for such pre-listing judicial review; and there are substantial constitutional and practical issues with respect to imposing such a requirement.  In the absence of additional evidence concerning the revised DHS TRIP, the Court cannot conclude that pre-deprivation judicial review and approval is constitutionally required, appropriate or even available.[9]

## B. Defendants' alternative motion to dismiss based on the State Secrets Privilege

The defendants have renewed their assertion of the state secrets privilege in the context of the cross motions for summary judgment on Plaintiff's procedural due process claims.[10] In assessing defendants' invocation of the state secrets privilege, the Court engages in a three-step process. First, the Court must determine whether the assertion of the privilege is procedurally proper.  Second, the Court must independently determine whether the information claimed to be privileged is, in fact, protected under the state secrets privilege. Third, the Court must determine whether the case can proceed if the information is protected by the state secrets privilege. *See Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1080 (9th Cir.2010); *United States v.*

---

[9] The No Fly List, as it presently exists, has been in effect for over ten years, with extensive experience under it. Substantial constitutional and other objections have been raised and, to some extent, sustained with respect to it.  Those objections have raised challenging and unresolved issues concerning the rights of American citizens within the context of the War on Terrorism. It may be helpful to the courts' dealing with these issues for Congress, at this point, to assess further that experience and further clarify its expectations for the constitutionally adequate treatment of affected travelers, particularly those who are American citizens.

[10] *See infra* at p. 7-8, Doc. No. 144 at p. 2-3.

*Reynolds,* 345 U.S. 1, 10 (1953)); *see also Abilt v. C.I.A.*, No. 1:14-CV-01031-GBL-ID, 2015 WL 566712, at \*5 (E.D. Va. Feb. 10, 2015).

### 1. Procedural Requirements for Invoking the Privilege

Defendants' assertion of the state secrets privilege must satisfy three procedural requirements. "First, the state secrets privilege must be asserted by the United States. It 'belongs to the Government and ... can neither be claimed nor waived by a private party.' Second, '[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter.' Third, the department head's formal privilege claim may be made only 'after actual personal consideration by that officer.'" *El-Masri v. United States*, 479 F.3d 296, 304 (4th Cir. 2007) (quoting *Reynolds, supra,* 345 U.S. at 7-8). The Court concludes that the defendants have properly asserted the privilege procedurally. The defendants have all been sued in their official capacity as heads of various departments of the United States government. The defendants' assertion of the privilege has been accompanied by a publicly filed sworn declaration by former Attorney General Eric H. Holder, Jr., filed in connection with defendants' May 28, 2014 motion to dismiss. Doc. No. 104-1 ("AG Declaration"). The AG Declaration further declares that "after careful and personal consideration of the matter, . . . disclosure of the three categories of information [described in the Declaration]. . . could reasonably be expected to cause significant harm to national security". *Id.* at ¶ 5.[11]

---

[11] The AG Declaration also states that the invocation of the state secrets privilege is consistent with Executive Branch policy issued on September 23, 2009 that the "Department will not defend an invocation of the privilege in order to . . . conceal violations of the law, inefficiency, or administrative error . . . prevent embarrassment . . . or prevent or delay the release of information the release of which would not reasonably be expected to cause significant harm to national security." Doc. No. 104-1 at p. 8.

2. Evaluation of the Privilege Claim and How the Case Should Proceed

"After a court has confirmed that the *Reynolds* procedural prerequisites are satisfied, it must determine whether the information that the United States seeks to shield is a state secret, and thus privileged from disclosure. This inquiry is a difficult one, for it pits the judiciary's search for truth against the Executive's duty to maintain the nation's security . . .." *El Masri, supra,* 479 F.3d at 304-05. This balancing leaves the judiciary "firmly in control of deciding whether an executive assertion of the state secrets privilege is valid, but subject to a standard mandating restraint in the exercise of its authority." *Id.* Nevertheless, "[a] court is obliged to honor the Executive's assertion of the privilege if it is satisfied, 'from all the circumstances of the case, that there is a reasonable danger that compulsion of the evidence will expose military matters which, in the interests of national security, should not be divulged." *Id.* at 305 (quoting *Reynolds,* 345 U.S. at 10).[12]

In their motion for summary judgment on the procedural due process claim, the defendants identify two specific types of evidence over which they assert the state secrets privilege: first, "evidence underlying Plaintiff's alleged placement on the No Fly List" and second, "information about the process provided to Plaintiff in order to evaluate the risk of erroneous deprivation in the value of substitute procedures." Doc. No. 159 at p. 38-39.   In support of this position, they have provided both a publically filed unclassified summary and an *ex parte, in camera* classified summary.

---

[12] Since *Reynolds*, Courts have expanded the state secrets privilege to matters related to "foreign-affairs," *El Masri*, 479 F.3d at 303, and "generally to *national security* concerns" such as information that could cause "impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments." *Ellsberg v. Mitchell*, 709 F.2d 51, 57 (D.C. Cir. 1983).

The public summary references three categories of information protected under the state secrets privilege: (1) subject identification (i.e. information that could tend to confirm or deny whether a particular individual was or was not the subject of an FBI investigation or intelligence operation); (2) reasons for investigation and results; and (3) sources and methods. The summary does not identify or describe any specific information but rather generally describes why information within these categories would be protected. The reasons include:

- Disclosure "would alert those subjects to the Government's interest in them and could cause them to attempt to flee, destroy evidence, or alter their conduct so as to avoid detection . . . [and] would seriously impede law enforcement and intelligence officers' ability to determine their whereabouts or gain further intelligence on their activities." Doc. No. 104-1 at ¶ 8;

- "[K]nowledge that [subjects of government interest]were under investigation could enable subjects to anticipate the actions of law enforcement and intelligence officers, possibly leading to counter-surveillance that could place federal agents at higher risk, and to ascertain the identities of confidential informants or other intelligence sources, placing those sources at risk." *Id.* ¶ 8;

- "[I]f the fact that some persons are not subject to investigation is disclosed, while the status of others is left unconfirmed, the disclosure would reveal that the FBI has had an investigative interest as to those other particular persons . . . [which] would enable individuals and terrorist groups alike to manipulate the system to discover whether they or their members are subject to investigation." *Id.* at ¶ 9;

- Individuals who discover that they are not being monitored could be motivated to commit terrorist acts. *Id.* at ¶ 9;

- Disclosing reasons for and results from an FBI counterterrorism investigation or an intelligence activity would "reveal to subjects who are involved in or planning to undertake terrorist activities what the FBI or the intelligence community knows or does not know about their plans and the threat they post to national security." *Id.* at ¶ 11;

- Even for those subjects without terrorist intentions, disclosure of the reasons could "reveal sensitive intelligence information about them, their associates, or a particular threat that would harm other investigations" and "could provide insights to persons intent on committing terrorist attacks as to what type of information is sufficient to trigger an inquiry by the United States Government, and what sources and methods the FBI may employ to obtain information about a person." *Id.* at ¶ 11;

- Disclosure of sources and methods "could reveal not only the identities of particular subjects but also the steps taken by the FBI in counterterrorism matters." *Id.* at ¶ 12;

- "Any effort to draw distinctions between disclosures that would and would not cause harm to national security interests would itself reveal sensitive FBI counterterrorism investigative or intelligence information," and disclosure of information as to one individual but not another, "then the very act of resisting disclosure would itself reveal the information that the Government seeks to protect." *Id.* at ¶ 13.

Defendants argue that this case cannot proceed because privileged information is at the heart of the case and is required to litigate both Mohamed's claims and the defendants' defenses.[13]   Claiming that defendants are attempting to invoke the privilege for purely tactical reasons, Mohamed emphasizes that "the record [] already . . . provides the facts needed to sustain his claims now." Doc. No. 119 at p. 4.  He points to his willingness to litigate without further discovery from the defendants and "that the government has litigated to the merits claims similar to Mohamed's, at trial and on summary judgment, without inadvertent disclosure of state secrets," *id.* at p. 7, referring to the *Latif* case, in which the state secrets privilege did not prevent the adjudication of similar due process claims.

The Court has reviewed and considered all of the submitted information in each of these categories, including the classified declarations, the underlying classified documents themselves, and the government's representations and explanations provided to the Court in its closed hearing on March 17, 2015.  Based on that review, the Court concludes that there are aspects of the information and documents at issue that are protected under the state secrets privilege. The

---

[13] The defendants point specifically to Mohamed's discovery requests, "seeking information related to his claims and allegations, namely, information concerning the watchlisting program generally and his situation individually." Doc. No. 105 at p. 5; *see also* Doc. No. 168 at p. 19 (where defendants argue for dismissal on the basis that "exclusion of evidence pursuant to the privilege prevents Defendants from fully litigating several aspects of the procedural due process claim, as well as from presenting a harmless error defense.").

Court also concludes that some of that information may be relevant and necessary for an adjudication of Mohamed's damages claims. However, even were all the information protected under the state secrets privilege, as the defendants claim (which the Court does not find), none of that information is necessary to establish either Mohamed's claim that he was denied constitutionally required procedural due process in connection with his denial of boarding or an available defense to that claim. [14]  The information claimed to be protected by the state secrets privilege in this action is not so central to Mohamed's procedural due process claims so as to prevent the adjudication of those claims on the merits. That procedural due process claim does not require reliance on any protected fact specific analysis that may have resulted in any placement on the No Fly List; rather, it requires an analysis of the procedures afforded to any U.S. citizen who is denied boarding on an aircraft, procedures that the defendants describe in detail in their public filings. For these reasons, the Court again concludes that the case need not be dismissed since the Court can adjudicate whether Mohamed had a constitutionally adequate opportunity to contest his status without any information claimed to be protected under the state secrets privilege.

### C. Plaintiff's remedy

Mohamed seeks as a remedy for this constitutional violation that he be removed from the No Fly List, as well as an award of compensatory and punitive damages.  However, at this point, Mohamed's remedy is limited to a constitutionally adequate opportunity to contest any

---

[14] The Court reaches this conclusion without the need to consider whether a level of protection short of the complete non-disclosure provided under the state secrets privilege would be adequate to protect information without endangering national security, such as the type of protective orders, redactions and summaries routinely used for highly sensitive information in other types of cases, both civil and criminal.

placement on the No Fly List, with an adjudication of any damages claims subject to further

consideration following the outcome of that process or Mohamed's choice to forego that process.

On June 24, 2014, the District Court in *Latif v. Holder, supra,* a case involving a similar

challenge to the No Fly List, ordered the government to "fashion new procedures that provide

Plaintiffs with the requisite due process described herein without jeopardizing national security"

which must include "notice . . .to permit each Plaintiff to submit evidence relevant to the reasons

for their respective inclusions on the No-Fly List" and "any responsive evidence that Plaintiffs

submit in the record to be considered at both the administrative and judicial stages of review,"

which may involve providing the plaintiffs "with unclassified summaries of the reasons for their

respective placement on the No-Fly List or disclose the classified reasons to properly-cleared

counsel." 28 F. Supp. 3d at 1161-62. On April 13, 2015, the government reported to the Court

that it was adopting for all persons seeking a review of their status those revisions to the DHS

TRIP made in response to the *Latif* Court's order. *See* Doc. No. 188.

Under the newly revised procedures, individuals who are denied boarding and apply for

redress through DHS TRIP will now receive a letter stating whether or not a person is listed on

the No Fly List, with the option to receive and/or submit additional information.  If the

individual elects to receive additional information, DHS TRIP will provide a second, more

detailed letter identifying the specific criterion under which the individual has been placed on the

No Fly List as well as "an unclassified summary of information supporting the individual's No

Fly List status, to the extent feasible, consistent with the national security and law enforcement

interests at stake." *Id.* The government explains that the amount and type of information

provided will vary on a case-by-case basis, and in some circumstances, an unclassified summary

may not be possible. The second letter will also invite the individual to submit written responses,

including exhibits and other materials that the individual deems relevant.  The TSA

Administrator or his or her designee will review such submissions, together with the unclassified

and classified information that is being relied upon to support the No Fly listing, and then will

issue a final determination.  TSA will provide the individual with a final written determination

containing the basis for the decision and notifying the individual of the ability to seek further

judicial review under 49 U.S.C. § 46110.

The Court cannot conclude based on the present record whether the revised DHS TRIP,

as described above, will provide a constitutionally adequate opportunity for Mohamed to have

his status reviewed. Rather, the revised  DHS TRIP process, as described to the Court, would

appear to allow for both a constitutionally adequate  post-deprivation review and also a

reviewing court to be presented with an administrative record that allows a sufficient assessment

concerning whether Mohamed was, in fact, given a constitutionally adequate opportunity to

challenge any placement on the No Fly List.  More specifically, the Court sees nothing in the

revised DHS TRIP that would preclude an adequate post deprivation process and the creation of

an administrative record that reflects (1) whether, if on the No Fly List, Mohamed was provided

the specific criteria relied on and the specific factual findings used to satisfy that specific criteria,

such that he was in a position to respond to the substance of any derogatory information relied

upon for the purposes of that placement; (2) whether there was a reasonable opportunity for

Mohamed to submit evidence that he does not satisfy the No Fly List criteria; (3) what

information was relied on for the No Fly List placement but withheld from Mohamed, the

reasons for withholding that information and the reasonableness of any such decisions, including

whether additional material information could have been provided, either directly or through

alternative means, such as summaries or redacted documents; (4) the extent to which Mohamed

26

provided information, or could have provided information, that met the substance of any reasons advanced by the government for his placement on the No Fly List and the TSA's response to any explanatory, clarifying, or exculpatory information; and (5) whether Mohamed's status is at the appropriate level of security restrictions for the level of threat sufficiently established by that administrative record, including why measures short of a total ban on air travel is warranted. [15] In short, how the revised DHS TRIP would in fact operate with respect to Mohamed's request for review of his status cannot be assessed with any certainty at this time; and the Court cannot therefore conclude as a matter of law, based on the present record, that Mohamed would not have a constitutionally adequate post-deprivation remedy through the revised DHS TRIP. That process would also allow the Court of Appeals for the Fourth Circuit to consider whether it has appropriate subject matter jurisdiction pursuant to 49 U.S.C. § 46110,[16] or whether further agency review would occur in this Court pursuant to the Administrative Procedure Act, 5 U.S.C. § 703.

### D. Remaining claims.

---

[15] The specific criteria that would place someone on the Selectee List, whereby air travel is permitted under heightened security screening, as opposed to the No Fly List and its total ban on air travel, is not clear from the public record and that issue remains unclear to the Court even in light of the totality of the information provided to the Court.

[16] Substantial issues exist concerning whether and in what form DHS TRIP adequately provides for judicial review of a decision to place someone on the No Fly List. *See Ege v. United States Department of Homeland Security*, 2015 WL 1903206, --- F.3d --- (D.C. Cir. 2015) (Court of Appeals has no jurisdiction pursuant to 49 U.S.C. § 46110 to order a person removed from the No Fly List); *Latif v. Holder*, 686 F.3d 1122, 1129 (9th Cir. 2012) (in action against TSA and TSC pursuant to 49 U.S.C. § 46110, Court of Appeals lacked subject matter jurisdiction to address the plaintiffs' procedural challenge to the DHS TRIP process). *See also* Doc. No. 45, in which the Fourth Circuit ruled that it did not have exclusive jurisdiction pursuant to 49 U.S.C. § 46110 because Mohamed's requested relief, removal from the No Fly List, would require orders against TSC as well as TSA. The Court does not believe it appropriate at this point to address this issue, which should be decided in the first instance by the Fourth Circuit upon review of a DHS TRIP decision.

The parties are directed to file with the Court no later than August 7, 2015 a report concerning what issues remain to be decided following the Court's rulings herein. Mohamed should also state whether at this point he wishes to request review of his status under the revised DHS TRIP, and if so, whether this action should be stayed pending the completion of that process.  The parties should also state whether the Court's rulings herein should be certified under Fed. R. Civ. P. 54(b) as a final judgment.

### IV. Conclusion

For the above reasons, the Court finds and concludes that Plaintiff is entitled to judgment as a matter of law on Count 3 of his Fourth Amended Complaint, and Plaintiff's Partial Motion for Summary Judgment [Doc. No. 161] will therefore be GRANTED in part and DENIED in part, and the defendant's Motion for Partial Summary Judgment [Doc. No. 158] will be DENIED.

An appropriate Order will issue.

/s/
_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
July 16, 2015