IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

GULET MOHAMED,                          )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )
                                        )        Civil Action No. 1:11cv0050 (AJT/MSN)
ERIC H. HOLDER, JR., *et al.*,          )
                                        )
                    Defendants.         )
_____ )

## MEMORANDUM OPINION

In this action, Plaintiff Gulet Mohamed ("Mohamed") has challenged his presumed

placement on the No Fly List (the "List"), a register of persons compiled by the Terrorism

Screening Center who are prohibited from flying on commercial airlines.  In support of his

claims, Mohamed contends that the No Fly List is unconstitutional and is otherwise unlawful

when applied to (1) a United States citizen; (2) who has not been convicted, arrested or charged

with any crime; and (3) as to whom the government has not demonstrated that there is probable

cause to believe that he has committed any crime or is about to commit any crime.  The Court

has already addressed Plaintiff's constitutional challenge based on procedural due process.[1]

---

[1] On December 9, 2014, the parties each filed motions for summary judgment as to Mohamed's procedural due process claim only.  (*See* ECF Nos. 158, 161.)  The Court determined that the DHS Traveler Redress Inquiry Program ("DHS TRIP"), a process by which a person denied boarding may request a review of his status, was constitutionally inadequate at the time Mohamed was denied boarding, that the revised DHS TRIP procedures ("DHS TRIP II") were not constitutionally invalid on their face, and that the constitutional adequacy of the revised procedures could not be assessed as applied until after Mohamed requested a status review under the revised system and the reviewing court had an administrative record before it.  *See Mohamed v. Holder* ("*Mohamed I*"), 995 F. Supp. 2d 520 (E.D. Va. 2014); *Mohamed v. Holder* ("*Mohamed II*"), No. 1:11–cv–50 (AJT/MSN), 2015 WL 4394958 (E.D. Va. July 16, 2015).  In its Order, the Court also outlined the procedural and substantive protection the Court would expect from the revised DHS TRIP review process.  On December 18, 2015, the Court ordered "that plaintiff file on or before January 4, 2016, a Notice concerning whether he intends to ask for review under the revised DHS TRIP, and if so, how this matter should proceed in light of that decision."  (ECF No. 204.)  On January 4, 2016, Mohamed filed a notice stating, "Plaintiff Gulet Mohamed will file a DHS TRIP complaint no later than January 18, 2016."  (ECF No. 206.)  Despite these representations, it appears that the Plaintiff has not requested any such review of his presumed placement on the No Fly List.

Now pending before the Court are the parties' cross-motions for summary judgment (ECF Nos. 217 & 221) on Plaintiff's remaining challenges to the No Fly List on the grounds that the No Fly List (1) violates the constitutional guarantee of substantive due process (Count I); (2) constitutes an unlawful agency action (Count II); and (3) violates the non-delegation principle (Count IV).[2] Fifth Amended Complaint (ECF No. 205) (the "FAC").

For the reasons stated below, the Court concludes that the No Fly List is not unconstitutional on substantive due process grounds, it is not unlawful under the non-delegation doctrine, and it does not exceed agency authority. Accordingly, the Court grants Defendants' motion, and denies Plaintiff's motion, as to Counts I, II, and IV.

## I.    BACKGROUND[3]

Mohamed, a U.S. citizen originally from Somalia, left the United States in 2009 at age sixteen to travel to Yemen, Somalia, and Kuwait for the purposes of visiting family, learning Arabic, and studying. On December 20, 2010, Mohamed went to an airport in Kuwait to renew his visa, but Kuwaiti authorities detained him. He alleges that over the next week, they interrogated, beat, and otherwise tortured him.[4] FBI agents visited him twice during this time. On January 16, 2011, Mohamed's family purchased an airplane ticket for him to return to the United States. Kuwaiti officials brought him to the airport, but he was denied boarding. On January 18, 2011, Mohamed filed this action against the heads of the Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), Terrorist Screen Center ("TSC"), Department

---

[2] Although the parties have only filed motions for summary judgment as to Counts I (substantive due process) and IV (non-delegation principle), the parties' fully briefed positions as to Count IV are inseparable from the issues presented in Count II (unlawful agency action); and the Court has therefore considered and ruled on Count II as well.

[3] The facts, as stated here, are undisputed unless otherwise noted. For a more complete description concerning the background of this case, see *Mohamed I*, 995 F. Supp. 2d at 522-27; *Mohamed II*, 2015 WL 4394958, at *2-4.

[4] Defendants agree that Mohamed was held by Kuwaiti authorities but dispute what occurred during his confinement. These issues are not relevant to the presently-pending motions.

of Homeland Security ("DHS"), and Transportation Security Administration ("TSA") (collectively, the "Defendants") seeking, *inter alia*, emergency relief to return to the United States.  The Court held a hearing the same day but continued the hearing when Defendants advised the Court that they would allow Mohamed to re-enter the United States.  Mohamed returned on a commercial flight three days later on January 21, 2011 and has not been criminally charged or detained since he returned.  He alleges that he remains on the No Fly List, however.

The No Fly List is a subset of the Terrorist Screening Database ("TSDB"), sometimes referred to as the "watchlist," an archive of information which is assembled and maintained by the TSC based on nominations from government agencies and supported by identifying information as well as "derogatory information," which must meet certain substantive criteria. In order to be placed in the TSDB, there must be "reasonable suspicion to establish that the individual is a known or suspected terrorist[,]"  Declaration of G. Clayton Grigg, Deputy Director for Operations of TSC (ECF No. 158-1) ("Grigg Decl.") ¶ 15; and the person must be "known or appropriately suspected to be or to have engaged in conduct constituting, in preparation for, in aid of, or related to terrorism," Declaration of Michael Steinbach, Assistant Director of the FBI Counterterrorism Division (ECF No. 158-2) ("Steinbach Decl.") ¶ 12.  *See also* Directive on Integration and Use of Screening Information to Protect Against Terrorism, HSPD–6 (Sept. 16, 2013).

As articulated by the Government, the overarching purpose of the No Fly List is twofold: (1) to protect commercial aircraft from terrorism and (2) to restrict the ability of persons suspected of terrorism to travel for the purposes of advancing their terrorist objectives.  *See* Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment (ECF No. 225) ("Defs.' Mem. Supp. Defs.' Mot.") 25-26 ("The No Fly List . . . protects the

national security by both preventing [radicalized] individuals from traveling abroad to engage in violence or become further radicalized . . . and by preventing foreign fighters who have traveled to conflict zones abroad from using the transportation system to harm or gain entry into the United States . . . ."); *see also id.* at 23 ("[A] preventative screening system necessarily needs to cover not only . . . those who . . . are likely to commit terrorist attacks, but also those who are reasonably suspected of posing a threat, regardless of whether they are known to have concrete plans to engage in the acts the No Fly List is designed to thwart.").  In addition to the substantive criteria that must be satisfied for placement in the TSDB, placement on the No Fly List requires the additional determination that there is "reasonable suspicion" that:

> The individual poses a threat of (1) committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft; (2) committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland; (3) committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations, U.S. ships, U.S aircraft, or other auxiliary craft owned or leased by the U.S. Government; or (4) engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

Grigg Decl. ¶ 18.  Moreover, this reasonable suspicion standard must be supported by "articulable" intelligence and must be based on the "totality of circumstances" and intelligence reviewed.[5]  *Id.* ¶ 16.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is

---

[5] Although the Government has never made public the number of individuals included either in the TSDB or on the No Fly List, it appears from publicly available information that the No Fly List includes substantially fewer individuals than the TSDB.  For this reason, it would appear that the substantive showing to qualify for inclusion in the TSDB is necessarily less than for inclusion on the No Fly List; however, it is not apparent from the record how suspicions and information sufficient to qualify for inclusion in the TSBD would be insufficient for additional inclusion on the No Fly List.

entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996).  The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  To defeat a properly supported motion for summary judgment, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").  Whether a fact is considered "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.  The facts must be viewed, and all reasonable inferences drawn, in the light most favorable to the nonmoving party.  *Id.* at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

### III.    JUSTICIABILITY

Defendants first argue that Plaintiff lacks standing to assert his claims to the extent that they relate to his right to exit and reenter the United States by traveling internationally.  Article III of the Constitution prohibits federal courts from hearing certain types of cases.  In order to be justiciable, a "case[]" or "controvers[y]" must exist.  U.S. Const. art. III, § 2, cl. 1.  Courts have

developed multiple doctrines to determine whether a "case or controversy" exists, one of which is the doctrine of standing.  At the summary judgment stage, in order to establish standing, the plaintiff must set forth specific facts to demonstrate that (1) he has "suffered an 'injury in fact' . . . which is (a) concrete and particularized . . . and (b) 'actual or imminent, not conjectural or hypothetical'"; (2) there exists "a causal connection between the injury and the conduct complaint of"; and (3) "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted).

Plaintiff alleges two forms of injury: (1) that the United States "prevented [him] from boarding an aircraft to return to the United States in January 2011," FAC ¶ 63, and (2) that the United States "ha[s] substantially burdened his fundamental right to return to the United States in the immediate future," *id.* ¶ 64.  Defendants contend that Plaintiff lacks standing to assert claims because he successfully reentered the United States in January 2011, and his future inability to reenter the United States is too speculative.  *See* Defs.' Mem. Supp. Defs.' Mot. 33-34.  The Court has already considered and dismissed Plaintiff's constitutional claim based on the events surrounding his return to the United Stated in January 2011.[6]  However, in its prior ruling, the Court declined to dismiss claims related to Mohamed's allegations of *future* harm.

Mohamed claims that were he not on the No Fly List, as he assumes he is, he would travel outside of the United States to visit relatives and to discharge obligations of his faith, but has not done so out of fear that he will not be able to reenter the United States.  Plaintiff's decision not to engage in international travel because of the difficulties he reasonably expects to encounter upon return to the United States is sufficient to demonstrate standing.  *See Suhre v.*

---

[6] Briefly summarized, the Court rejected Plaintiff's claim on the grounds that under the particular circumstances, the four to five-day delay he experienced in returning to the United States did not unduly burden his right of reentry. *Mohamed I*, 995 F. Supp. 2d at 537.

*Haywood Cty.*, 131 F.3d 1083, 1088 (4th Cir. 1997) ("Forcing an Establishment Clause plaintiff

to avoid the [Government action] of which he complains in order to gain standing to challenge it

only imposes an extra penalty on individuals already alleged to be suffering a violation of their

constitutional rights."); *Hernandez v. Cremer*, 913 F.2d 230, 234-35 (5th Cir. 1990) (finding

plaintiff who testified that he "would like to return to Mexico, but did not 'want to run the risk of

something like this happening again'" had standing to challenge government procedural

requirements for investigating claims of border entry applicants (citation omitted)); *see also*

*Suhre*, 131 F.3d at 1091 ("[P]ast injury [i]s probative of likely future injury.").  Accordingly, the

Court concludes that Mohamed has standing to assert all of his claims related to the No Fly List.

## IV.    <u>COUNT I</u>: PLAINTIFF'S SUBSTANTIVE DUE PROCESS CLAIM

Plaintiff asserts what he characterizes as a "facial challenge" to the No Fly List and also

an "as applied" challenge on substantive due process grounds.  However, upon closer

examination of those claims, Plaintiff's "facial challenge" and "as applied" challenge are

fundamentally the same since Plaintiff's "as applied" challenge is not based on any claim that

there is an insufficient factual basis to place the Plaintiff on the No Fly List based on the criteria

used for that purpose.  Instead, Mohamed argues that the No Fly List necessarily violates

substantive due process because the criteria used allows placement on the No Fly List of any

person who, like the Plaintiff, is (1) a United States citizen; (2) who has never been convicted,

arrested or charged with any crime; and (3) as to whom the government has not demonstrated

that there is probable cause to believe that he has committed any crime or is about to commit any

crime.[7]  In this regard, Mohamed takes the position that because nothing more than a "predictive

---

[7] In Count I, Mohamed variously articulates his substantive due process challenge as "fact-specific, as applied," "broad, as-applied," and "facial."  *See* FAC ¶¶ 59-62.  Specifically, he argues in the alternative that (1) his designation, (2) the designation of any U.S. citizen not charged with a crime, and (3) the List, in any application,

judgment" is used to determine who among the general population of "innocents" presents a sufficient threat of future terrorist related conduct, the protections of substantive process requires that the criteria for placement on the No Fly List exclude the above described category of American citizens.  For these reasons, and while acknowledging that protecting the public against terrorist threats is a compelling government interest, Mohamed contends that the criteria used is not narrowly tailored to pass constitutional muster and does not otherwise constitute a necessary regulation furthering a compelling state interest.[8]

To support his claim that the No Fly List violates the constitutional guarantee of substantive due process, Mohamed centrally relies on the right of movement, as recognized by the Supreme Court in *Kent v. Dulles*, 357 U.S. 116 (1958), *Shapiro v. Thompson*, 394 U.S. 618 (1969), *overruled on other grounds by Edelman v. Jordan*, 415 U.S. 651 (1974), and subsequent related holdings.  Based on this right of movement, Mohamed claims that he also has a constitutionally protected fundamental right to travel both domestically and internationally and that the List violates that right.[9]

The Due Process Clause of the Fifth Amendment guarantees that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V. Unlike procedural due process, substantive due process "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'"  *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (citation omitted).  It

---

each violate substantive due process.  Because the Court concludes that none of Mohamed's challenges violates substantive due process, it does not distinguish between the three forms of his claim.

[8] Mohamed claims that the No Fly List actually makes us less safe by systematically allowing those who would do us harm the ability to gauge the Government's interest in them and permitting them to take steps to avoid those regulations.

[9] Plaintiff recognizes that "[w]hat Defendants call Mohamed's right of reentry is only an aspect of his general right of movement."  Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (ECF No. 232.) ("Pl.'s Mem. Opp'n Defs.' Mot.") 30.  Other courts that have decided right of reentry claims have also analyzed such claims as aspects of the right to travel internationally rather than as distinctive rights.  *See, e.g.*, *Hernandez v. Cremer*, 913 F.2d 230, 234 (5th Cir. 1990).

"provides heightened protection against government interference with certain fundamental rights and liberty interests," which are held to a more exacting standard of strict scrutiny. *Washington v. Glucksburg*, 521 U.S. 702, 719 (1997). Mohamed's substantive due process claim therefore depends, in part, on whether Plaintiff's fundamental right of travel has been substantially burdened and is therefore subject to strict scrutiny. If a fundamental right is implicated and strict scrutiny therefore applies, a law will not be upheld unless the government demonstrates that the law is necessary to further a compelling governmental interest and has been narrowly tailored to achieve that interest. *Hawkins v. Freeman*, 195 F.3d 732, 739 (4th Cir. 1999); *see also Reno v. Flores*, 507 U.S. 292, 302 (1993). If a right is not fundamental, then the law that allegedly burdens the right is ordinarily subject to rational basis review, and will be deemed constitutional unless the plaintiff can demonstrate that it is not reasonably related to a rational government interest.[10]

### A. Plaintiff's Challenge is Subject to Strict Scrutiny.

#### 1. There is a fundamental right to interstate, but not international, travel.

United States citizens enjoy the right to engage in both interstate and international travel. It is also well established that there is a fundamental right to interstate travel. *See Califano v. Aznavorian*, 439 U.S. 170, 176 (1978) ("[T]he constitutional right to interstate travel [has been] recognized by this Court for over 100 years."). "The constitutional right of interstate travel is virtually unqualified." *United States v. Guest*, 383 U.S 745, 757-58 (1966); *see also Shapiro*, 394 U.S. at 629 ("all citizens be free to travel throughout the length and breadth of our land

---

[10] Courts have also recognized an "intermediate" level of scrutiny that applies to laws affecting certain "quasi-suspect classes." *See Craig v. Boren*, 429 U.S. 190 (1976) (gender); *Mathews v. Lucas*, 427 U.S. 495 (1976) (legitimacy of birth). A law that classifies people within these classes "must serve important government objects and must be substantially related to the achievement of those objectives. *See Craig*, 429 U.S. at 197.

uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement."). However, the same cannot be said with respect to the right to international travel.

Historically, the *Glucksburg* analysis has applied to the determination of whether a right is fundamental. That analysis requires "a careful description of the asserted fundamental liberty interests," which must be "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksburg*, 521 U.S. at 720-21. The Supreme Court's recent decision in *Obergefell v. Hodges* has expanded the scope of that analysis. *See Obergefell*, 135 S. Ct. 2584, 2598 (2015) ("History and tradition guide and discipline this inquiry but do not set its outer boundaries."). Specifically, under *Obergefell*, in addition to considering the United States' history and traditions, courts must also evaluate "any history and tradition of animus that motivates the legislative restriction on the freedom." *Sturniak v. Lynch*, 159 F. Supp. 3d 643, 667 (E.D. Va. 2016).

In support of his claim that the fundamental right of travel extends to international as well as interstate travel, the Plaintiff relies generally on the historic protections afforded to the freedom of movement ever since before the founding of this country, including protections provided under the Articles of Confederation and international agreements to which the United States is party. *See, e.g.*, Universal Declaration of Human Rights, *adopted* Dec. 10, 1948, art. XIII (All people have "the right to freedom of movement . . . [as well as] the right to leave any country, including his own, and to return to his country."); International Covenant on Civil and Political Rights, *adopted* Dec. 16, 1966, art. 12.1-12.4 (Everyone has the "right to liberty of movement . . . [and] shall be free to leave any country, including his own . . . [and] shall not be arbitrarily deprived of the right to enter his own country."); *see also* Plaintiff's Memorandum of

Law in Support of Plaintiff's Motion for Summary Judgment (ECF No. 222) ("Pl.'s Mem. Supp. Pl.'s Mot.") 9-10.[11]  Mohamed also claims that Congress's Article I authority to regulate commerce with foreign states anticipates an international "zone of movement."  *Id.* at 11.  He argues that many First Amendment freedoms, such as the free exercise of religion, cannot be fully enjoyed without recognizing the right to travel internationally, such as by traveling to Mecca to fulfill the Islamic duty of hajj.  *Id.* at 12.  According to Mohamed, the Citizenship Clause[12] also implies a fundamental right to international travel because a citizen's right to be in the United States is obstructed if he or she cannot travel to the United States from an international destination.  *Id.* at 12-13.  Based on this long-standing recognition that the freedom of movement is a core constitutional value, Plaintiff asks this Court to "recognize zones of movement emanating from various constitutional guarantees . . . [j]ust as the Supreme Court in *Griswold* recognized 'zones of privacy' in threading together various constitutional guarantees."  *Id.* at 11.

There is much to warrant extending the fundamental right to travel or movement to include international travel.  As Plaintiff correctly observes, the right to international travel is recognized by international agreements to which the United States is a party, and in today's world, restricting a person's right to international travel can, in some circumstances, have as profound an adverse effect on a person's ability to exercise other liberty interests as a restriction on the right to interstate travel.  As the Court has previously observed, interstate and international travel are increasingly seamless and we can no longer reasonably view interstate and international travel as discrete and separable activities.  *See Mohamed II*, 2015 WL 4394958,

---

[11] These international agreements have the legal force equivalent to an act of Congress.  *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 315 (1829) (A treaty is "equivalent to an act of the legislature . . . ."), *overruled on other grounds by United States v. Percheman*, 32 U.S. (7 Pet.) 51 (1833)).

[12] "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."  U.S. Const. amend. XIV, § 1.

at *6 ("It must be recognized that a meaningful right of travel in today's world cannot be understood as cleanly divided between interstate and international travel . . . .").

Nevertheless, the United States also has a long history of judicially sanctioned restrictions on citizens' international travel in the interests of foreign affairs and national security that would never have been countenanced with respect to interstate travel, including, among others, restrictions on the issuance and use of passports and the imposition of travel bans.  *See, e.g.*, *Regan v. Wald*, 468 U.S. 222, 242-44 (1984) (upholding regulations "preventing travel to Cuba by most American citizens"); *Haig v. Agee*, 453 U.S. 280, 293 (1981) ("The history of passport controls since the earliest days of the Republic shows congressional recognition of Executive authority to withhold passports . . . .").  Moreover, the Supreme Court has strongly implied, though it has not explicitly stated, that there is no fundamental right to international travel.  *See Haig*, 453 U.S. at 307 (The Supreme Court "has often pointed out the crucial difference between the freedom to travel internationally and the right of interstate travel.").  The Supreme Court has also observed:

> "The constitutional right of interstate travel is virtually unqualified." . . . By contrast the "right" of international travel has been considered to be no more than an aspect of the "liberty" protected by the Due Process Clause of the Fifth Amendment.  As such this "right," the Court has held, can be regulated within the bounds of due process.

*Califano*, 439 U.S. at 176 (quoting *United States v. Guest*, 383 U.S. 745, 757-58 (1966)). Implicitly rejecting the notion that international travel is a fundamental right, the Court in *Haig* explained that international travel "is subject to *reasonable* governmental regulation."  453 U.S. at 306 (emphasis added).  And under the recent *Obergefell* analysis, there has been no history or tradition of Congressional animus that has led it to restrict the freedom to travel internationally. For these reasons, there is very little jurisprudential basis upon which to recognize a fundamental right to international travel; and under the current state of the law, the constitutionality of the No

Fly List based on its effect on any right to international travel must be assessed under the rational basis test.  Because the No Fly List will survive that level of review if it were to survive strict scrutiny, the Court will first consider the constitutionality of the No Fly List based on its effect on the fundamental right of interstate travel.

  **2.**  **The No Fly List significantly interferes with the fundamental right to travel domestically.**

  A fundamental right will only be implicated by a government policy that, at a minimum, "significantly interferes with the exercise of a fundamental right." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978).  The List significantly interferes with Mohamed's fundamental right to interstate travel and is therefore subject to strict scrutiny.  *See Mohamed II*, 2015 WL 4394958, at *6 (observing within the context of Plaintiff's procedural due process claim that Plaintiff's liberty interest was "strong and deserving of strong protections against unnecessary government restrictions.").  Although the List does not prevent designees from traveling domestically, it limits their practical ability to do so.  As the Court has already stated, "a meaningful right to travel in today's world cannot be understood as . . . a right without any correlative rights with respect to the usual and available means in a modern society."  *Mohamed II*, 2015 WL 4394958, at *6.[13]

---

[13] The Government glosses over the List's effect on interstate travel, maintaining that "courts have repeatedly held that there is no right to travel by a particular means, even if it is the most convenient mode of travel."  Defendants' Memorandum of Law in Reply in Support of Defendants' Motion for Summary Judgment (ECF No. 242) ("Defs.' Reply Supp. Defs.' Mot.") 13 n.8; *see also* Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (ECF No. 228) ("Defs.' Mem. Opp'n Pl.'s Mot.") 15-16.  However, none of these non-binding precedents deal with a *complete ban* on any particular mode of travel, such as that which the List imposes. *See Gilmore v. Gonzales*, 435 F.3d 1125, 1136-37 (9th Cir. 2009) (TSA required passengers to present identification or be subject to search); *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) (town law restricted high-speed ferry service to and from town); *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 535 (6th Cir. 2007) (state law limited issuance of drivers licenses to citizens and lawful permanent residents); *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) (state law required provision of social security number to renew driver's license); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) (federal law restricted flights from Texas airport to the four contiguous states only); *Green v. Transp. Sec. Admin.*, 351 F. Supp. 2d 1119, 1128-30 (W.D. Wash. 2005) (passengers were subject to enhanced security screening of one hour or less prior to flying).

The effect of the No Fly List on the fundamental right of interstate travel is at least as great as other effects on fundamental rights found to constitute significant interference.  For example, in *Zablocki v. Redhail*, 434 U.S. 374 (1978), the Supreme Court found that a state law requiring a court order to marry under certain circumstances constituted a "significant interference" with the fundamental right to marry because it "significantly discouraged" marriage.  434 U.S. at 387 n.12.  As this Court has previously discussed, placement on the No Fly List does far more than "significantly discourage" designees from traveling; it often absolutely bars them from so doing and effectively precludes them from engaging in a wide range of constitutionally protected activities.  *See Mohamed II*, 2015 WL 4394958, at *6.[14]

## B.      The No Fly List Survives Strict Scrutiny.

Under strict scrutiny, a law will be struck down unless the Government shows that it is "necessary to further a compelling governmental interest" and that it is "narrowly tailored to further that interest."  *Grutter v. Bollinger*, 539 U.S. 306, 308 (2003); *see also Shapiro*, 394 U.S. at 634 (1969) (Laws that burden interstate travel must "be necessary to promote a compelling governmental interest.").

### 1.      The government interest is compelling.

There is obviously a compelling government interest in preventing terrorist attacks against commercial aviation.  *See, e.g.*, *Haig*, 453 U.S. at 307 ("It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." (quoting

---

[14] Because the List may be made available within and among U.S. government agencies, foreign governments, and airlines and other common carriers, it also has the potential to stigmatize a listed individual and thereby interfere with his employment prospects and general enjoyment of life.  Although the Plaintiff does not specifically allege a "stigma-plus" claim (presumably because he cannot show the deprivation of a specific tangible "liberty" or "property" interest in connection with the stigma), *see Paul v. Davis*, 424 U.S. 693, 710-11 (1976), he nevertheless argues that the List restricts his enjoyment of other rights such as his right to freely practice his religion by attending religious conferences and his abilities to visit his family in California, study Arabic, travel with friends, and take vacations with his wife.  *See id.* at 20-21; Pl.'s Mem. Supp. Pl's Mot. 15.

*Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964))).[15]  As this Court previously stated, "[t]here can be no doubt that the government has the right and obligation to identify . . . and stop those who present such a [terrorist] threat."  *Mohamed I*, 995 F. Supp. 2d at 527.  Indeed, it is "the most compelling of governmental duties."  *Id.*

### 2. The No Fly List is sufficiently necessary and, under properly applied procedural protections, narrowly tailored to further the government interest.

To survive strict scrutiny, a regulation must be "specifically and narrowly framed to accomplish" its purpose.  *Grutter*, 539 U.S. at 333 (internal quotation marks omitted) (citation omitted).  A regulation that is significantly under inclusive or over inclusive is not "narrowly tailored."  However, the Government need not first exhaust "every conceivable" alternative; rather, it must show that no "workable . . . alternatives" would achieve the Government's interest.  *Fisher v. Univ. of Texas at Austin*, 133 S. Ct. 2411, 2420 (2013).  Here, when administered with the properly applied procedural protections for review of a person's status that are now embedded in the revised DHS TRIP II review process, the No Fly List is narrowly tailored to further the Government's compelling interest in combating terrorism and protecting national security.

Mohamed argues that the List is both under inclusive and over inclusive and that the Government could use alternative means to achieve its interest.  Mohamed claims that the List is under inclusive because it (1) only restricts movement by plane, (2) is easily evaded by changes in a designee's appearance or identification to avoid detection, and (3) requires the Government to disclose its investigative interest, thereby *endangering* national security by alerting potential terrorists that the Government is monitoring them.  Pl.'s Mem. Supp. Pl.'s Mot. 19-22.

---

[15] *See also Zemel v. Rusk*, 381 U.S. 1, 13-17 (1965); *Cole v. Young*, 351 U.S. 536, 546 (1956); *United States v. Sterling*, 724 F.3d 482, 509 (4th Cir. 2013); *United States v. Ghailani*, 733 F.2d 29, 47 (2d Cir. 2013); *Jifry v. FAA*, 370 F.3d 1174, 1183 (D.C. Cir. 2004); *United States v. Morison*, 844 F.2d 1057, 1082 (4th Cir. 1988).

Mohamed also contends that the List is over inclusive because it (1) bans mostly legal conduct, (2) classifies individuals based on inaccurate predictive judgments, and (3) prevents from flying even persons as to whom enhanced screening would adequately address the Government's compelling interest.  *Id.* at 22-24.  In place of the List, as it is formulated under the current criteria, Plaintiff claims that the Government could adequately protect aviation safety by (1) searching designees prior to boarding, (2) investigating designees more thoroughly, (3) requiring additional security measures on airplanes, (4) arresting persons who present actual threats to aviation, and (5) tracking designees' movements around the country.  *Id.* at 24-28.

The Government contends that "the Executive Branch has developed carefully calibrated standards and criteria geared toward identifying those reasonably likely to commit violent acts of terrorism," and "the Government has a host of procedures and safeguards in place to keep the risk of error to a minimum."  Defs.' Mem. Opp'n Pl.'s Mot. 16-17.  In that regard, the Government argues that, while there is some possibility that the List allows a person suspected of terrorism to learn of the government's investigative interest and with that knowledge engaged in activities designed to evade detection, the List provides protections not otherwise obtainable and on balance provides a measure of security that exceeds any of the possible consequences that the Plaintiff cites.  The Government further argues that it is entitled to make strategic decisions about the types of travel (i.e., by plane) that are most susceptible to terrorism because no single counterterrorism measure can thwart every attack, and other measures exist to address other threats.  Concerning the List's alleged over inclusiveness, the Government claims that the List does not prevent legal conduct apart from traveling by airplane and that U.S. security analysts are trained and over time have proven effective in making the predictive judgments involved with the List, as Congress directed the Executive Branch to make.  It also points to the graduated

nature of the entire watchlist system, which accounts for several different categories of threatening individuals but denies boarding to only one of them.  It highlights that nominations to the List are subject to five independent levels of review, which narrow it to the most threatening individuals.

The Government also argues, based on the testimony of counterterrorism professionals, that Plaintiff's proposed alternatives are inadequate.  *See* Defs.' Mem. Supp. Defs.' Mot. 26-33. As an example, the Government contends that no level of screening can protect against some threats, such as those that use an "insider" airport employee, unless certain individuals are prevented entirely from  accessing secured areas or boarding aircrafts.  *Id.* at 31.  It also argues that Plaintiff's alternative of excluding U.S. citizens not convicted or charged with a crime is not a workable alternative because there are times when (1) the Government has a reasonable belief that an individual poses a substantial terrorist threat, but is not yet in a position to charge a crime; or (2) the Government has probable cause to believe the individual has committed a crime, but it would be dangerous or strategically detrimental to begin criminal proceedings.  *Id.* at 27.

Assessing whether the List is appropriately tailored to pass constitutional muster raises unsettled issues concerning how and to what extent these types of Executive Branch judgments are subject to judicial review.[16]  As a general proposition, in the realm of national security, governmental determinations, such as these, are due deference but are not unreviewable.  *See Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (When "it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of the courts is

---

[16]  In opposing the Government's motion for summary judgment, the Plaintiff has taken the position that an evidentiary hearing is necessary for the Court to determine whether the No Fly List is "narrowly tailored" to achieve its objectives.  The Court has concluded that given the deference to be accorded national security judgments, and the facial reasonableness and plausibility of the Government's positions, as supported by detailed declarations of high level agency officials, the constitutional issues can be resolved on summary judgment.  However, this conclusion is subject to reasonable debate.  As the Court has previously observed, the No Fly List represents an unprecedented assertion of Executive Branch authority and Plaintiff's position concerning the necessary record upon which to decide the constitutional issues is not insubstantial.

marked,' and respect for the Government's conclusions is appropriate." (internal citation omitted)); *see also Kliendienst v. Mandel*, 408 U.S. 753, 770 (1972) (concluding that where the government has provided a facially legitimate and bona fide reason, "the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the First Amendment interests of those who [claim they are injured by the visa denial]"); *Washington v. Trump*, 847 F.3d 1151, 1161 (9th Cir. 2017).

In assessing whether the No Fly List is narrowly tailored to serve a compelling government interest, the relevant context is not, as Plaintiff contends, all forms of public transportation that may be vulnerable to a terrorist threat, but rather, specifically, commercial aviation, with its special vulnerabilities. In that regard, the Government has provided cogent reasons as to why each of the alternatives to the List that Plaintiff has suggested would be inadequate. Moreover, whether the No Fly List is narrowly tailored also cannot be divorced from the procedures in place to review whether someone should be on the List. As reflected in the Court's Memorandum Opinion dated July 16, 2015, the Court expects that through the DHS TRIP review process, a person who thinks he is on the No Fly List will have a meaningful opportunity to know and respond to the factual basis for his inclusion. The Court also expects that an administrative record will be created that gives a reviewing court the necessary information to determine whether the applicable criteria has been satisfied, whether there has, in fact, been a meaningful opportunity to know and challenge any derogatory information, and whether the "predictive judgments" embedded in that criteria are sufficiently anchored in facts to justify the substantial infringements that are imposed on a person by virtue of his inclusion on the No Fly List. *See Mohamed II*, 2015 WL 4394958, at *13.

For all these reasons, Court finds that the List is necessary and sufficiently narrowly tailored to achieve a compelling government interest and therefore does not violate Plaintiff's substantive due process rights.

### C.     The No-Fly List Passes Rational Basis Review as Applied to International Travel.

Under rational basis review, the plaintiff bears the burden to demonstrate that the Government's chosen means is not "rationally related to a legitimate state interest."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).  For the above reasons, the Government's interest here is compelling, and the means chosen to achieve it are narrowly tailored.  Therefore, the List also survives rational basis review as it applies to international travel.

### V.     COUNT IV: NON-DELEGATION

In Count IV, Plaintiff claims (1) that Congress violated the non-delegation doctrine and (2) that TSC and TSA have exceeded their authority.  *See* FAC ¶¶ 71-72 ("Congress' [w]atchlist [d]elegation was [u]nconstitutional and Defendant TSA [l]acks [c]ongressional [a]uthorization to [a]dminister DHS TRIP as it [c]urrently [e]xists." ).

The non-delegation doctrine holds that "Congress may not constitutionally delegate its legislative power to another branch of Government."  *Touby v. United States*, 500 U.S. 160, 165 (1991).  This doctrine "is rooted in the principle of separation of powers that underlies our tripartite system of Government."  *Mistretta v. United States*, 488 U.S. 361, 371 (1989).  However, "[s]o long as Congress '. . . lay[s] down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'"  *Id.* at 372 (quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)).

19

The Supreme Court has only twice sustained a non-delegation challenge.  In *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), the statute at issue "provided literally no guidance for the exercise of discretion."  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001).  In the only other successful non-delegation challenge,[17] the statute "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'"  *Id.*

After the September 11, 2001 terrorist attacks, Congress gave the TSA "responsib[ility] for security in all modes of transportation."  49 U.S.C. § 114(d).  Specific to aviation security, TSA must work with the FBI to "assess current and potential threats to the domestic air transportation system" and "decide on and carry out the most effective method for continuous analysis and monitoring of security threats to that system."  49 U.S.C. § 44904(a).  Congress directed TSA to "share . . . data on individuals identified . . . who may pose a risk to transportation or national security" and to "notif[y] . . . airport or airline security officers of the identity of [such] individuals."  49 U.S.C. § 114(h)(1)-(2).  TSA must also,

> in consultation with other appropriate Federal agencies and air carriers, establish policies and procedures requiring air carriers (A) to use information from government agencies to identify individuals on passenger lists who may be a threat to civil aviation or national security; and (B) if such an individual is identified, notify appropriate law enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual.

49 U.S.C. § 114(h)(3).

Congress also required that DHS "establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by [TSA], United States Customs and Border Protection, or any other office or component of [DHS]."  49 U.S.C. § 44926(a).  In

---

[17] *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935).

that regard, DHS is required to "establish a procedure to enable airline passengers . . . to appeal such determination [that they pose a security threat] and correct information contained in the system."  49 U.S.C. § 44903(j)(2)(C)(iii).

Plaintiff largely conflates his argument concerning the non-delegation doctrine with his claim that TSA exceeded its statutory authority; he argues that the statute is drafted too vaguely and that this Court should therefore exercise constitutional avoidance so as to construe it in a way that disallows the List.  The statute does not provide an "intelligible principle," the Plaintiff contends, because it does not specifically describe what level of threat is necessary for TSA to deny a passenger boarding.

Upon review of the applicable statutes, the Court concludes that Congress has provided "intelligible principles" both as to the goals TSA should seek to achieve and also how it should go about achieving them, while leaving the day-to-day implementation of the scheme to TSA. Most importantly, Congress has specifically directed TSA to "prevent the individual [who may be a threat to civil aviation or national security] from boarding an aircraft," 49 U.S.C. § 114(h)(3)(B), which is exactly what the List does.

## VI.    COUNT II: UNLAWFUL AGENCY ACTION

In Count II, Plaintiff claims that the Defendants have committed unlawful agency action and asks this Court to construe 49 U.S.C. § 114 in such a way that the creation and use of the No Fly List exceeds any delegated authority.[18]  As discussed above, Congress has provided TSA with three different tangible means of addressing threats, one of which is to prohibit passengers

---

[18] In further support of this position, Plaintiff also argues that in order to avoid the constitutional issues raised by the Defendants' exercise of what the Defendants claim is their delegated authority, the Court should, under the doctrine of "constitutional avoidance," construe that authority in a way that precludes the No Fly List, as it presently exists under the criteria for inclusion. Given that that the Court has rejected Plaintiff's constitutional claims, there is no need to avoid any constitutional issue with respect to the No Fly List arising out of the exercise of delegated authority.

from boarding aircrafts.  TSA, in turn, has used that statutory authority to respond to different

threat levels in different ways.  For example, while some individuals are denied boarding, others

who are perceived as lesser threats are placed on the Selectee List and are subject to additional

screening.  TSA has not undertaken an unlawful agency action that is arbitrary, capricious, an

abuse of discretion, or not otherwise in accordance with law or contrary to a constitutional right

but, rather, has acted within the scope of the authority delegated to it.[19]  Accordingly, the Court

grants Defendants summary judgment on Count IV.

## VII.  CONCLUSION

For the reasons set forth above, this Court GRANTS Defendants' motion for summary

judgment and DENIES Plaintiff's motion for summary judgment as to Counts I, II and IV, and

those counts are DISMISSED.

The Court will issue an appropriate order.

The Clerk is directed to forward a copy of this Memorandum Opinion to all counsel of

record.

/s/

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
July 20, 2017

---

[19] Although not briefed in his motion for summary judgment, Plaintiff has alleged in his complaint the related claim that "Congress has not delegated to TSA the authority to create a process that can culminate in the removal of individuals from the TSDB" and that "Congress's delegation to TSA to create a redress process is defective because the Executive Branch has allocated watchlist authority in a manner that prevents TSA from creating a redress process." FAC ¶¶ 74-75.  In fact, Congress has specifically directed TSA to "establish a timely and fair process for individuals identified [under TSA's passenger screening system] to appeal to [TSA] the determination and correct any erroneous information." 49 U.S.C. §§ 44903(j)(2)(C)(iii)(I), (j)(2)(G)(i).  Defendant has done that in the form of DHS TRIP and has revised its procedures in response to judicial decisions, including one in this litigation.